# SEARS, ROEBUCK & CO. *v.* SAN DIEGO COUNTY DIS-
# TRICT COUNCIL OF CARPENTERS

No. 76–750.   Argued November 7, 1977—Decided May 15, 1978

STEVENS, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., *post,* p. 208, and POWELL, J., *post,* p. 212, filed concurring opinions. BRENNAN, J., filed a dissenting opinion, in which STEWART and MARSHALL, JJ., joined, *post,* p. 214.

*H. Warren Siegel* argued the cause for petitioner. With him on the briefs were *Lawrence M. Cohen* and *Jeffrey S. Goldman.*

*Jerry J. Williams* argued the cause for respondent. With him on the brief were *J. Albert Woll* and *Laurence Gold.**

---

*John W. Noble, Jr.,* filed a brief for the American Retail Federation as *amicus curiae* urging reversal.

*Solicitor General McCree, John S. Irving, Carl L. Taylor, Norton J. Come,* and *Linda Sher* filed a brief for the National Labor Relations Board as *amicus curiae* urging affirmance.

Mr. Justice Stevens delivered the opinion of the Court.

The question in this case is whether the National Labor Relations Act, as amended,[1] deprives a state court of the power to entertain an action by an employer to enforce state trespass laws against picketing which is arguably—but not definitely—prohibited or protected by federal law.

I

On October 24, 1973, two business representatives of respondent Union visited the department store operated by petitioner (Sears) in Chula Vista, Cal., and determined that certain carpentry work was being performed by men who had not been dispatched from the Union hiring hall. Later that day, the Union agents met with the store manager and requested that Sears either arrange to have the work performed by a contractor who employed dispatched carpenters or agree in writing to abide by the terms of the Union's master labor agreement with respect to the dispatch and use of carpenters. The Sears manager stated that he would consider the request, but he never accepted or rejected it.

Two days later the Union established picket lines on Sears' property. The store is located in the center of a large rectangular lot. The building is surrounded by walkways and a large parking area. A concrete wall at one end separates the lot from residential property; the other three sides adjoin public sidewalks which are adjacent to the public streets. The pickets patrolled either on the privately owned walkways next to the building or in the parking area a few feet away. They carried signs indicating that they were sanctioned by the "Carpenters Trade Union." The picketing was peaceful and orderly.

Sears' security manager demanded that the Union remove

---

[1] 49 Stat. 449, as amended, 29 U. S. C. §§ 151–169 (1970 ed. and Supp. V). Hereinafter, the National Labor Relations Act will be referred to as the Act or the NLRA.

the pickets from Sears' property. The Union refused, stating that the pickets would not leave unless forced to do so by legal action. On October 29, Sears filed a verified complaint in the Superior Court of California seeking an injunction against the continuing trespass; the court entered a temporary restraining order enjoining the Union from picketing on Sears' property. The Union promptly removed the pickets to the public sidewalks.[2] On November 21, 1973, after hearing argument on the question whether the Union's picketing on Sears' property was protected by state or federal law, the court entered a preliminary injunction.[3] The California Court of Appeal affirmed. While acknowledging the pre-emption guidelines set forth in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236,[4] the court held that the Union's continuing trespass fell within the longstanding exception for conduct which touched interests so deeply rooted in local feeling and responsibility that pre-emption could not be inferred in the absence of clear evidence of congressional intent.[5]

---

[2] Although Sears claimed that some deliverymen and repairmen refused to cross the picket lines on the public sidewalks, the Union ultimately concluded that the picketing was then too far removed from the store to be effective. The picketing was discontinued on November 12.

[3] The Superior Court apparently rested its decision on two grounds: (1) that the injunction was not prohibited by state law, and (2) that the picketing was not protected by the First and Fourteenth Amendments of the Federal Constitution. Transcript of Preliminary Injunction Hearing, App. 32. Thus, the precise issue presently before the Court was not decided until the case reached the Court of Appeal.

[4] The court was referring to this statement in the *Garmon* opinion:
"When an activity is arguably subject to § 7, or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U. S., at 245.

[5] The court also reaffirmed the conclusion of the Superior Court that the injunction was not prohibited by either state law or the Federal Constitution.
In concluding that the state courts were "not preempted from exercising their general jurisdiction in matters of trespass related to labor disputes,"

The Supreme Court of California reversed. 17 Cal. 3d 893, 553 P. 2d 603. It concluded that the picketing was arguably protected by § 7 of the Act, 29 U. S. C. § 157, because it was intended to secure work for Union members and to publicize Sears' undercutting of the prevailing area standards for the employment of carpenters. The court reasoned that the trespassory character of the picketing did not disqualify it from arguable protection, but was merely a factor which the National Labor Relations Board would consider in determining whether or not it was in fact protected. The court also considered it "arguable" that the Union had engaged in recognitional picketing subject to § 8 (b)(7)(C) of the Act, 29 U. S. C. § 158 (b)(7)(C), which could not continue for more than 30 days without petitioning for a representation election. Because the picketing was both arguably protected by § 7 and arguably prohibited by § 8, the court held that state jurisdiction was pre-empted under the *Garmon* guidelines.

Since the Wagner Act was passed in 1935, this Court has not decided whether, or under what circumstances, a state court has power to enforce local trespass laws against a union's peaceful picketing.[6] The obvious importance of this problem led us to grant certiorari in this case. 430 U. S. 905.[7]

---

App. to Pet. for Cert. A–10, the Court of Appeal noted that the right to peaceful possession of property was regarded as basic in California and that the assumption of state jurisdiction would not directly infringe on the jurisdiction of the National Labor Relations Board, since no attempt had been made to invoke that jurisdiction. In a subsequent amended opinion, the Court of Appeal also emphasized the fact that the trial court injunction was narrowly confined to the " 'location' of the controversy as opposed to the purpose of the acts . . . and did not deny the Union effective communication with all persons going to Sears." 125 Cal. Rptr. 245, 252 (1975).

[6] The issue was left open by the Court in *Meat Cutters* v. *Fairlawn Meats, Inc.*, 353 U. S. 20, 24–25. Cf. *Taggart* v. *Weinacker's, Inc.*, 283 Ala. 171, 214 So. 2d 913 (1968), cert. dismissed, 397 U. S. 223.

[7] The state courts have divided on the question of state-court jurisdic-

## II

We start from the premise that the Union's picketing on Sears' property after the request to leave was a continuing trespass in violation of state law.[8] We note, however, that the scope of the controversy in the state court was limited. Sears asserted no claim that the picketing itself violated any state or federal law. It sought simply to remove the pickets from its property to the public walkways, and the injunction issued by the state court was strictly confined to the relief sought. Thus, as a matter of state law, the location of the picketing was illegal but the picketing itself was unobjectionable.

As a matter of federal law, the legality of the picketing was unclear. Two separate theories would support an argument by Sears that the picketing was prohibited by § 8 of the NLRA, and a third theory would support an argument by the Union that the picketing was protected by § 7. Under each of these theories the Union's purpose would be of critical importance.

If an object of the picketing was to force Sears into assigning the carpentry work away from its employees to Union members

---

tion over peaceful trespassory activity. For cases in addition to this one in which pre-emption was found, see, e. g., *Reece Shirley & Ron's, Inc.* v. *Retail Store Employees,* 222 Kan. 373, 565 P. 2d 585 (1977); *Freeman* v. *Retail Clerks,* 58 Wash. 2d 426, 363 P. 2d 803 (1961). For cases reaching a contrary conclusion, see, e. g., *May Department Stores Co.* v. *Teamsters,* 64 Ill. 2d 153, 355 N. E. 2d 7 (1976); *People* v. *Bush,* 39 N. Y. 2d 529, 349 N. E. 2d 832 (1976); *Hood* v. *Stafford,* 213 Tenn. 684, 378 S. W. 2d 766 (1964).

[8] The State Superior Court and the Court of Appeal concluded that the Union's activity violated state law. Because it concluded that the state courts lacked jurisdiction to entertain the state trespass claim, the California Supreme Court did not address the merits of the lower court rulings. The Union contends that those rulings were incorrect. Though we regard the state-law issue as foreclosed in this Court, there is of course nothing in our decision on the pre-emption issue which bars consideration of the Union's arguments by the California Supreme Court on remand.

dispatched from the hiring hall, the picketing may have been prohibited by § 8 (b) (4) (D).[9] Alternatively, if an object of the picketing was to coerce Sears into signing a prehire or members-only type agreement with the Union, the picketing was at least arguably subject to the prohibition on recognitional picketing contained in § 8 (b) (7) (C).[10] Hence, if Sears had filed an unfair labor practice charge against the Union, the Board's concern would have been limited to the question whether the Union's picketing had an objective proscribed by the Act; the location of the picketing would have been irrelevant.

On the other hand, the Union contends that the sole objective of its action was to secure compliance by Sears with

---

[9] Section 8 (b) (4) (D) provides in part that it shall be an unfair labor practice for a labor organization or its agents—

"to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is—

.        .        .        .        .

"forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work." 29 U. S. C. § 158 (b) (4) (D).
There are two provisos to § 8 (b) (4) which exempt certain conduct from its prohibitions, but they appear to have no application in this case.

[10] Section 8 (b) (7) (C) provides in part that "[i]t shall be an unfair labor practice for a labor organization or its agents—

.        .        .        .        .

"to picket . . . any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees . . . unless such labor organization is currently certified as the representative of such employees:

.        .        .        .        .

"where such picketing has been conducted without a petition . . . [for a representation election] being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing. . . ."
29 U. S. C. § 158 (b) (7) (C).

area standards, and therefore the picketing was protected by § 7. *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195. Thus, if the Union had filed an unfair labor practice charge under § 8 (a)(1) when Sears made a demand that the pickets leave its property, it is at least arguable that the Board would have found Sears guilty of an unfair labor practice.

Our second premise, therefore, is that the picketing was both arguably prohibited and arguably protected by federal law. The case is not, however, one in which "it is clear or may fairly be assumed" that the subject matter which the state court sought to regulate—that is, the location of the picketing—is either prohibited or protected by the Federal Act.

## III

In *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236, the Court made two statements which have come to be accepted as the general guidelines for deciphering the unexpressed intent of Congress regarding the permissible scope of state regulation of activity touching upon labor-management relations. The first related to activity which is clearly protected or prohibited by the federal statute.[11] The second articulated a more sweeping prophylactic rule:

> "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations

---

[11] As to conduct clearly protected or prohibited by the federal statute, the Court stated:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. To leave the States free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." 359 U. S., at 244.

Board if the danger of state interference with national policy is to be averted." *Id.,* at 245.

While the *Garmon* formulation accurately reflects the basic federal concern with potential state interference with national labor policy, the history of the labor pre-emption doctrine in this Court does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected.[12]   As the Court noted last Term:

"Our cases indicate . . . that inflexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State's interest is one that does not threaten undue interference with the federal regulatory scheme." *Farmer* v. *Carpenters,* 430 U. S. 290, 302.

Thus the Court has refused to apply the *Garmon* guidelines in a literal, mechanical fashion.[13]   This refusal demonstrates that

---

[12] This sensitivity to the consequences of pre-emption is undoubtedly attributable, at least in part, to the way in which the labor pre-emption doctrine has evolved.   The doctrine is to a great extent the result of this Court's ongoing effort to decipher the presumed intent of Congress in the face of that body's steadfast silence.   Mr. Justice Frankfurter aptly described the difficulty of this never-completed task: "The statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature, to be translated into concreteness by the process of litigating elucidation." *Machinists* v. *Gonzales,* 356 U. S. 617, 619.   And it is "because Congress has refrained from providing specific directions with respect to the scope of pre-empted state regulation, [that] the Court has been unwilling to 'declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions . . . .' " *Farmer* v. *Carpenters,* 430 U. S. 290, 295–296 (citation omitted).

[13] "We have refused to apply the pre-emption doctrine to activity that otherwise would fall within the scope of *Garmon* if that activity 'was a merely peripheral concern of the Labor Management Relations Act . . .

"the decision to pre-empt . . . state court jurisdiction over a given class of cases must depend upon the nature of the particular interests being asserted and the effect upon the administration of national labor policies" of permitting the state court to proceed. *Vaca* v. *Sipes,* 386 U. S. 171, 180.[14]

[or] touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.' . . . We also have refused to apply the pre-emption doctrine 'where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes.' " *Id.,* at 296–297.

The Court's rejection of an inflexible pre-emption approach is reflected in other situations as well. Where only a minor aspect of the controversy presented to the state court is arguably within the regulatory jurisdiction of the Labor Board, the Court has indicated that the *Garmon* rule should not be read to require pre-emption of state jurisdiction. *Hanna Mining Co.* v. *Marine Engineers,* 382 U. S. 181. The Court has also indicated that if the state court can ascertain the actual legal significance of particular conduct under federal law by reference to "compelling precedent applied to essentially undisputed facts," *San Diego Building Trades Council* v. *Garmon,* 359 U. S., at 246, the court may properly do so and proceed to adjudicate the state cause of action. Permitting the state court to proceed under these circumstances deprives the litigant of the argument that the Board should reverse its position, or, perhaps, that precedent is not as compelling as one adversary contends.

[14] "In addition to the judicially developed exceptions referred to in [n. 13, *supra*], Congress itself has created exceptions to the Board's exclusive jurisdiction in other classes of cases. Section 303 of the Labor Management Relations Act, 1947, 61 Stat. 158, as amended, 29 U. S. C. § 187, authorizes anyone injured in his business or property by activity violative of § 8 (b) (4) of the NLRA, 61 Stat. 140, as amended, 29 U. S. C. § 158 (b) (4), to recover damages in federal district court even though the underlying unfair labor practices are remediable by the Board. See *Teamsters* v. *Morton,* 377 U. S. 252 (1964). Section 301 of the LMRA, 29 U. S. C. § 185, authorizes suits for breach of a collective-bargaining agreement even if the breach is an unfair labor practice within the Board's jurisdiction. See *Smith* v. *Evening News Assn.,* 371 U. S. 195 (1962). Section 14 (c) (2) of the NLRA, as added by Title VII, § 701 (a) of the

With this limitation in mind, we turn to the question whether pre-emption is justified in a case of this kind under either the arguably protected or the arguably prohibited branch of the *Garmon* doctrine. While the considerations underlying the two categories overlap, they differ in significant respects and therefore it is useful to review them separately. We therefore first consider whether the arguable illegality of the picketing as a matter of federal law should oust the state court of jurisdiction to enjoin its trespassory aspects. Thereafter, we consider whether the arguably protected character of the picketing should have that effect.

## IV

The enactment of the NLRA in 1935 marked a fundamental change in the Nation's labor policies. Congress expressly recognized that collective organization of segments of the labor force into bargaining units capable of exercising economic power comparable to that possessed by employers may produce benefits for the entire economy in the form of higher wages, job security, and improved working conditions. Congress decided that in the long run those benefits would outweigh the occasional costs of industrial strife associated with the organization of unions and the negotiation and enforcement of collective-bargaining agreements. The earlier notion that union activity was a species of "conspiracy" and that strikes and picketing were examples of unreasonable restraints of trade was replaced by an unequivocal national declaration of policy establishing the legitimacy of labor unionization and encouraging the practice of collective bargaining.[15]

---

Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 541, 29 U. S. C. § 164 (c) (2), permits state agencies and state courts to assert jurisdiction over 'labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction.'" *Farmer* v. *Carpenters, supra,* at 297 n. 8.

[15] For a brief summary of the development of this national policy, see R. Gorman, Labor Law 1–6 (1976).

The new federal statute protected the collective-bargaining activities of employees and their representatives and created a regulatory scheme to be administered by an independent agency which would develop experience and expertise in the labor relations area. The Court promptly decided that the federal agency's power to implement the policies of the new legislation was exclusive and the States were without power to enforce overlapping rules.[16] Accordingly, attempts to apply provisions of the "Little Wagner Acts" enacted by New York [17] and Wisconsin [18] were held to be pre-empted by the potential conflict with the federal regulatory scheme. Consistently with these holdings, the Court also decided that a State's employment relations board had no power to grant relief for violation of the federal statute.[19] The interest in uniform development of the new national labor policy required that matters which fell squarely within the regulatory jurisdiction of the federal Board be evaluated in the first instance by that agency.

The leading case holding that when an employer grievance against a union may be presented to the National Labor Rela-

---

[16] "Comparison of the State and Federal statutes will show that both governments have laid hold of the same relationship for regulation, and it involves the same employers and the same employees. Each has delegated to an administrative authority a wide discretion in applying this plan of regulation to specific cases, and they are governed by somewhat different standards. Thus, if both laws are upheld, two administrative bodies are asserting a discretionary control over the same subject matter, conducting hearings, supervising elections and determining appropriate units for bargaining in the same plant.

.      .      .      .      .

"We therefore conclude that it is beyond the power of New York State to apply its policy to these appellants as attempted herein." *Bethlehem Steel Co. v. New York Labor Relations Bd.*, 330 U. S. 767, 775–777.

[17] See n. 16, *supra*.

[18] *La Crosse Telephone Corp.* v. *Wisconsin Employment Relations Bd.*, 336 U. S. 18, 24–26.

[19] *Plankinton Packing Co.* v. *Wisconsin Employment Relations Bd.*, 338 U. S. 953.

tions Board it is not subject to litigation in a state tribunal is *Garner* v. *Teamsters,* 346 U. S. 485. *Garner* involved peaceful organizational picketing which arguably violated § 8 (b)(2) of the federal Act.[20] A Pennsylvania equity court held that the picketing violated the Pennsylvania Labor Relations Act and therefore should be enjoined. The State Supreme Court reversed because the union conduct fell within the jurisdiction of the National Labor Relations Board to prevent unfair labor practices.

This Court affirmed because Congress had "taken in hand this particular type of controversy . . . [i]n language almost identical to parts of the Pennsylvania statute," 346 U. S., at 488. Accordingly, the State, through its courts, was without power to "adjudge the same controversy and extend its own form of relief." *Id.,* at 489. This conclusion did not depend on any surmise as to "how the National Labor Relations Board might have decided this controversy had petitioners presented it to that body." *Ibid.* The precise conduct in controversy was arguably prohibited by federal law and therefore state jurisdiction was pre-empted. The reason for pre-emption was clearly articulated:

> "Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies. Indeed, Pennsylvania passed a statute the same year as its labor relations Act reciting abuses of the injunction in labor litigations attributable more to procedure and usage than to substantive rules. A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law. The same

---

[20] The apparent objective of the picketing was to pressure an employer into coercing employees into joining the union.

reasoning which prohibits federal courts from intervening in such cases, except by way of review or on application of the federal Board, precludes state courts from doing so. Cf. *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41; *Amalgamated Utility Workers* v. *Consolidated Edison Co.,* 309 U. S. 261." *Id.,* at 490–491 (footnote omitted). "The conflict lies in remedies . . . . [W]hen two separate remedies are brought to bear on the same activity, a conflict is imminent." *Id.,* at 498–499.

This reasoning has its greatest force when applied to state laws regulating the relations between employees, their union, and their employer.[21] It may also apply to certain laws of general applicability which are occasionally invoked in connection with a labor dispute.[22] Thus, a State's antitrust law may not be invoked to enjoin collective activity which is also arguably prohibited by the federal Act. *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501; *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468.[23] In each case, the pertinent inquiry is whether

---

[21] This Court has summarily reversed several cases in which the state court purported to regulate labor union activities under provisions of state labor laws comparable to the prohibitions of the federal Act. See, e. g., *Pocatello Building & Constr. Trades Council* v. *C. H. Elle Constr. Co.,* 352 U. S. 884, rev'g 78 Idaho 1, 297 P. 2d 519 (1956); *Electrical Workers* v. *Farnsworth & Chambers Co.,* 353 U. S. 969, rev'g 201 Tenn. 329, 299 S. W. 2d 8 (1957).

[22] As the Court noted recently in *Farmer* v. *Carpenters:* "[I]t is well settled that the general applicability of a state cause of action is not *sufficient* to exempt it from pre-emption. '[I]t [has not] mattered whether the States have acted through laws of broad general application rather than laws specifically directed towards the governance of industrial relations.' . . . Instead, the cases reflect a balanced inquiry into such factors as the nature of the federal and state interests in regulation and the potential for interference with federal regulation." 430 U. S., at 300 (emphasis added).

[23] As Professor Cox has noted:

"[A]n antitrust statute is not the kind of general law [which should avoid the reach of the pre-emption doctrine]. Such statutes are based

the two potentially conflicting statutes were "brought to bear on precisely the same conduct." *Id.*, at 479.[24]

On the other hand, the Court has allowed a State to enforce

---

upon a view of policy towards combinations and collective action in the market place which is the very subject addressed by Congress in the NLRA. That the state laws primarily apply to business combinations and merely sweep collective action by employees within the same rule does not sufficiently lessen the narrowness of focus." Labor Law Preemption Revisited, 85 Harv. L. Rev. 1337, 1357 (1972).

[24] "Respondent argues that Missouri is not prohibiting the IAM's conduct for any reason having to do with labor relations but rather because that conduct is in contravention of a state law which deals generally with restraint of trade. It distinguishes *Garner* on the ground that there the State and Congress were both attempting to regulate labor relations as such.

"We do not think this distinction is decisive. In *Garner* the emphasis was not on two conflicting labor statutes but rather on two similar remedies, one state and one federal, brought to bear on precisely the same conduct." 348 U. S., at 479.

*Motor Coach Employees* v. *Lockridge*, 403 U. S. 274, reaffirmed the notion that state regulation of activity arguably prohibited by the federal Act cannot avoid pre-emption simply because it is pursuant to a law of general application. In *Lockridge*, a union member who failed to pay his monthly dues was suspended from membership in the union and discharged from employment at union request. The union's conduct in securing Lockridge's discharge was arguably prohibited by §§ 8 (b) (1) (A) and 8 (b) (2) or protected by § 7. But rather than filing an unfair labor practice charge with the Labor Board, Lockridge brought suit in state court on a breach-of-contract theory. He alleged that the union breached a promise implicit in the union constitution that it would not secure his discharge pursuant to the union security clause in the collective-bargaining agreement for missing one month's dues.

The Court noted that both the state court and the Board would "inquire into the proper construction of union regulations in order to ascertain whether the union properly found [Lockridge] to have been derelict in his dues-paying responsibilities, where his discharge was procured on the asserted grounds of nonmembership in the union." 403 U. S., at 293. The Court further noted that the "possibility that, in defining the scope of the union's duty to [Lockridge], the state courts would directly and

certain laws of general applicability even though aspects of the challenged conduct were arguably prohibited by § 8 of the NLRA. Thus, for example, the Court has upheld state-court jurisdiction over conduct that touches "interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *San Diego Building Trades Council* v. *Garmon,* 359 U. S., at 244. See *Construction Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656 (threats of violence); *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131 (violence); *Automobile Workers* v. *Russell,* 356 U. S. 634 (violence); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (libel); *Farmer* v. *Carpenters,* 430 U. S. 290 (intentional infliction of mental distress).

In *Farmer,* the Court held that a union member, who alleged that his union had engaged in a campaign of personal abuse and harassment against him, could maintain an action for damages against the union and its officers for the intentional infliction of emotional distress. One aspect of the alleged campaign was discrimination by the union in hiring hall refer-

---

consciously implicate principles of federal law . . . was real and immediate. . . . Lockridge's entire case turned upon the construction of the applicable union security clause, a matter as to which . . . federal concern is pervasive and its regulation complex." *Id.,* at 296. Pre-emption was required in the Court's view because the state court was exercising jurisdiction over a controversy which was virtually identical to that which could have been presented to the Board. Permitting the state court to exercise jurisdiction pursuant to a law of general application in these circumstances would have entailed a " 'real and immediate' potential for conflict with the federal scheme. . . ." *Farmer* v. *Carpenters,* 430 U. S., at 301 n. 10.

An identical result would undoubtedly obtain were an employer subjected to recognitional or secondary picketing to seek injunctive relief in state court on the theory that the union was tortiously interfering with his freedom to contract. Cf. *Retail Clerks* v. *J. J. Newberry Co.,* 352 U. S. 987, summarily rev'g 78 Idaho 85, 298 P. 2d 375 (1956).

rals. Although such discrimination was arguably prohibited by §§ 8 (b)(1)(A) and 8 (b)(2) of the NLRA and therefore an unfair labor practice charge could have been filed with the Board, the Court permitted the state action to proceed.

The Court identified those factors which warranted a departure from the general pre-emption guidelines in the "local interest" cases. Two are relevant to the arguably *prohibited* branch of the *Garmon* doctrine.[25] First, there existed a significant state interest in protecting the citizen from the challenged conduct. Second, although the challenged conduct occurred in the course of a labor dispute and an unfair labor practice charge could have been filed, the exercise of state jurisdiction over the tort claim entailed little risk of interference with the regulatory jurisdiction of the Labor Board. Although the arguable federal violation and the state tort arose in the same factual setting, the respective controversies

---

[25] One of the factors identified by the Court was that the conduct giving rise to the state cause of action (*e. g.*, violence, libel, or intentional infliction of emotional distress), if proved, would not be protected by § 7 of the NLRA, and therefore there existed no risk that state regulation of the conduct *alleged in the complaint* would result in prohibition of conduct protected by the federal Act. To this extent, the instant case is not controlled by the decision in *Farmer*. Sears' state cause of action was for trespass, and some trespassory union activity may be protected under the federal Act. See Part V, *infra*. However, two points must be made regarding the apparent distinction between *Farmer* and the case at bar. First, *Farmer* itself involved some risk that protected conduct would be regulated; for, while the complaint *alleged* outrageous conduct, there remained a possibility that the plaintiff would only have been able to *prove* a robust intra-union dispute and that the state tribunal would have found that sufficient to support recovery. Second, the distinction between this case and *Farmer*, to the extent that it exists, has significance only with respect to the arguably *protected* branch of the *Garmon* doctrine, which we discuss in Part V; it does not detract from the support *Farmer* provides for our conclusion with respect to pre-emption under the arguably *prohibited* branch of the doctrine.

presented to the state and federal forums would not have been the same.[26]

The critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner*) or different from (as in *Farmer*) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.[27]

---

[26] As the Court explained:

"If the charges in Hill's complaint were filed with the Board, the focus of any unfair labor practice proceeding would be on whether the statements or conduct on the part of union officials discriminated or threatened discrimination against him in employment referrals for reasons other than failure to pay union dues. . . . Whether the statements or conduct of the respondents also caused Hill severe emotional distress and physical injury would play no role in the Board's disposition of the case, and the Board could not award Hill damages for pain, suffering, or medical expenses. Conversely, the state-court tort action can be adjudicated without resolution of the 'merits' of the underlying labor dispute. Recovery for the tort of emotional distress under California law requires proof that the defendant intentionally engaged in outrageous conduct causing the plaintiff to sustain mental distress. . . . The state court need not consider, much less resolve, whether a union discriminated or threatened to discriminate against an employee in terms of employment opportunities. To the contrary, the tort action can be resolved without reference to any accommodation of the special interests of unions and members in the hiring hall context.

"On balance, we cannot conclude that Congress intended to oust state-court jurisdiction over actions for tortious activity such as that alleged in this case. At the same time, we reiterate that concurrent state-court jurisdiction cannot be permitted where there is a realistic threat of interference with the federal regulatory scheme." 430 U. S., at 304–305.

[27] While the distinction between a law of general applicability and a law expressly governing labor relations is, as we have noted, not disposi-

In the present case, the controversy which Sears might have presented to the Labor Board is not the same as the controversy presented to the state court. If Sears had filed a charge, the federal issue would have been whether the picketing had a recognitional or work-reassignment objective; decision of that issue would have entailed relatively complex factual and legal determinations completely unrelated to the simple question whether a trespass had occurred.[28] Conversely, in the state action, Sears only challenged the location of the picketing; whether the picketing had an objective proscribed by federal law was irrelevant to the state claim. Accordingly, permitting the state court to adjudicate Sears' trespass claim would create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices.

The reasons why pre-emption of state jurisdiction is normally appropriate when union activity is arguably prohibited by federal law plainly do not apply to this situation; they therefore are insufficient to preclude a State from exercising jurisdiction limited to the trespassory aspects of that activity.

---

tive for pre-emption purposes, it is of course apparent that the latter is more likely to involve the accommodation which Congress reserved to the Board. It is also evident that enforcement of a law of general applicability is less likely to generate rules or remedies which conflict with federal labor policy than the invocation of a special remedy under a state labor relations law.

[28] Moreover, decision of that issue would not necessarily have determined whether the picketing could continue. For the Board could conclude that the *picketing* was not prohibited by either § 8 (b) (4) (D) or § 8 (b) (7) (C) without reaching the question whether it was protected by § 7. If the Board had concluded that the picketing was not prohibited, Sears would still have been confronted with picketing which violated state law and was arguably protected by federal law. Thus, the filing of an unfair labor practice charge could initiate complex litigation which would not necessarily lead to a resolution of the problem which led to this litigation.

## V

The question whether the arguably protected character of the Union's trespassory picketing provides a sufficient justification for pre-emption of the state court's jurisdiction over Sears' trespass claim involves somewhat different considerations.

Apart from notions of "primary jurisdiction," [29] there would be no objection to state courts' and the NLRB's exercising concurrent jurisdiction over conduct prohibited by the federal Act. But there is a constitutional objection to state-court interference with conduct actually protected by the Act.[30]

---

[29] In this opinion, the term "primary jurisdiction" is used to refer to the various considerations articulated in *Garmon* and its progeny that militate in favor of pre-empting state-court jurisdiction over activity which is subject to the unfair labor practice jurisdiction of the federal Board. This use of the term should not be confused with the doctrine of primary jurisdiction, which has been described by Professor Davis as follows:

"The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court.

"The doctrine of primary jurisdiction does not necessarily allocate power between courts and agencies, for it governs only the question whether court or agency will *initially* decide a particular issue, not the question whether court or agency will *finally* decide the issue." 3 K. Davis, Administrative Law Treatise § 19.01, p. 3 (1958) (emphasis in original).

While the considerations underlying *Garmon* are similar to those underlying the primary-jurisdiction doctrine, the consequences of the two doctrines are therefore different. Where applicable, the *Garmon* doctrine completely pre-empts state-court jurisdiction unless the Board determines that the disputed conduct is neither protected nor prohibited by the federal Act.

[30] Although it is clear that a state court may not exercise jurisdiction over protected conduct, it is important to note that the word "protected" may refer to two quite different concepts: union conduct which the State may not prohibit and against which the employer may not retaliate because it is covered by § 7 or conduct which a State may not prohibit even

Considerations of federal supremacy, therefore, are implicated to a greater extent when labor-related activity is protected than when it is prohibited. Nevertheless, several considerations persuade us that the mere fact that the Union's trespass was *arguably* protected is insufficient to deprive the state court of jurisdiction in this case.

The first is the relative unimportance in this context of the "primary jurisdiction" rationale articulated in *Garmon*. In theory, of course, that rationale supports pre-emption regardless of which section of the NLRA is critical to resolving a controversy which may be subject to the regulatory jurisdiction of the NLRB. Indeed, at first blush, the primary-jurisdiction rationale provides stronger support for pre-emption in this case when the analysis is focused upon the arguably protected, rather than the arguably prohibited, character of the Union's conduct. For to the extent that the Union's picketing was arguably protected, there existed a potential overlap between the controversy presented to the state court

though it is not covered by § 7 of the Act. The Court considered protected conduct in the latter sense in *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132. There, the Court relied on a line of pre-emption analysis "focusing upon the crucial inquiry whether Congress intended that the conduct involved be unregulated because left 'to be controlled by the free play of economic forces.' *NLRB* v. *Nash-Finch Co.,* 404 U. S. 138, 144 (1971)." *Id.,* at 140.

The Union does not claim that trespassory picketing is protected from state interference under this doctrine. We merely identify this line of pre-emption analysis in order to make it perfectly clear that it is unaffected by our consideration of the significance of the status of the picketing as arguably protected under § 7 of the Act. We also note, however, that in the cases in which pre-emption exists even though neither § 7 nor § 8 of the Act is even arguably applicable, there is, by hypothesis, no opportunity for the National Labor Relations Board to make the initial evaluation of the controversy. In these cases, the pre-emption issue is necessarily addressed in the first instance by a state tribunal, and that tribunal must decide whether or not the conduct is actually privileged from governmental regulation.

and that which the Union might have brought before the
NLRB.[31] Prior to granting any relief from the Union's con-
tinuing trespass, the state court was obligated to decide that
the trespass was not actually protected by federal law, a
determination which might entail an accommodation of Sears'
property rights and the Union's § 7 rights. In an unfair labor
practice proceeding initiated by the Union, the Board might
have been required to make the same accommodation.[32]

Although it was theoretically possible for the accommoda-
tion issue to be decided either by the state court or by the
Labor Board, there was in fact no risk of overlapping jurisdic-
tion in this case. The primary-jurisdiction rationale justifies
pre-emption only in situations in which an aggrieved party
has a reasonable opportunity either to invoke the Board's
jurisdiction himself or else to induce his adversary to do so.
In this case, Sears could not directly obtain a Board ruling on
the question whether the Union's trespass was federally pro-
tected. Such a Board determination could have been obtained
only if the Union had filed an unfair labor practice charge
alleging that Sears had interfered with the Union's § 7 right to
engage in peaceful picketing on Sears' property. By demand-
ing that the Union remove its pickets from the store's property,
Sears in fact pursued a course of action which gave the Union

---

[31] As noted in Part IV, *supra,* the primary-jurisdiction rationale of
*Garmon* did not require pre-emption of state jurisdiction over the Union's
picketing insofar as it may have been prohibited by § 8, since the con-
troversy presented to the state court was not the same controversy which
Sears could have presented to the Board. In deciding the state-law issue,
the Court had no occasion to interpret or enforce the prohibitions in
§ 8 of the federal Act; in deciding the unfair labor practice question, the
Board's sole concern would have been the objective, not the location, of
the challenged picketing.

[32] That accommodation would have been required only if the Board
first found that the object of the picketing was to maintain area stand-
ards. Of course, if Sears had initiated the proceeding before the Board,
the location of the picketing would have been entirely irrelevant and no
question of accommodation would have arisen. See n. 31, *supra.*

the opportunity to file such a charge. But the Union's response to Sears' demand foreclosed the possibility of having the accommodation of § 7 and property rights made by the Labor Board; instead of filing a charge with the Board, the Union advised Sears that the pickets would only depart under compulsion of legal process.

In the face of the Union's intransigence, Sears had only three options: permit the pickets to remain on its property; forcefully evict the pickets; or seek the protection of the State's trespass laws. Since the Union's conduct violated state law, Sears legitimately rejected the first option. Since the second option involved a risk of violence, Sears surely had the right—perhaps even the duty—to reject it. Only by proceeding in state court, therefore, could Sears obtain an orderly resolution of the question whether the Union had a federal right to remain on its property.

The primary-jurisdiction rationale unquestionably requires that when the same controversy may be presented to the state court or the NLRB, it must be presented to the Board. But that rationale does not extend to cases in which an employer has no acceptable method of invoking, or inducing the Union to invoke, the jurisdiction of the Board.[33] We are therefore persuaded that the primary-jurisdiction rationale does not provide a *sufficient* justification for pre-empting state jurisdiction over arguably protected conduct when the party who

---

[33] Even if Sears had elected the self-help option, it could not have been assured that the Union would have invoked the jurisdiction of the Board. The Union may well have decided that the likelihood of success was remote and outweighed by the cost of the effort and the probability that Sears in turn would have charged the Union with violating § 8 (b)(4)(D) or § 8 (b)(7)(C) of the Act. Moreover, if Sears had elected this option, and the pickets were evicted with more force than reasonably necessary, it might have exposed itself to tort liability under state law. We are unwilling to presume that Congress intended to require employers to pursue such a risky course in order to ensure that issues involving the scope of § 7 rights be decided only by the Labor Board.

could have presented the protection issue to the Board has not done so and the other party to the dispute has no acceptable means of doing so.[34]

This conclusion does not, however, necessarily foreclose the possibility that pre-emption may be appropriate. The danger of state interference with federally protected conduct is the principal concern of the second branch of the *Garmon* doctrine. To allow the exercise of state jurisdiction in certain contexts might create a significant risk of misinterpretation of federal law and the consequent prohibition of protected conduct. In those circumstances, it might be reasonable to infer that Congress preferred the costs inherent in a jurisdictional hiatus to the frustration of national labor policy which might accompany the exercise of state jurisdiction. Thus, the acceptability of "arguable protection" as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that § 7 does in fact protect the disputed conduct.

---

[34] "If the National Labor Relations Act provided an effective mechanism whereby an employer could obtain a determination from the National Labor Relations Board as to whether picketing is protected or unprotected, I would agree that the fact that picketing is 'arguably' protected should require state courts to refrain from interfering in deference to the expertise and national uniformity of treatment offered by the NLRB. But an employer faced with 'arguably protected' picketing is given by the present federal law no adequate means of obtaining an evaluation of the picketing by the NLRB. The employer may not himself seek a determination from the Board and is left with the unsatisfactory remedy of using 'self-help' against the pickets to try to provoke the union to charge the employer with an unfair labor practice.

"So long as employers are effectively denied determinations by the NLRB as to whether 'arguably protected' picketing is actually protected except when an employer is willing to threaten or use force to deal with picketing, I would hold that only labor activity determined to be actually, rather than arguably, protected under federal law should be immune from state judicial control. To this extent *San Diego Building Trades Council v. Garmon*, 359 U. S. 236 (1959), should be reconsidered." *Longshoremen v. Ariadne Shipping Co.*, 397 U. S. 195, 201–202 (WHITE, J., concurring).

The Court has held that state jurisdiction to enforce its laws prohibiting violence,[35] defamation,[36] the intentional infliction of emotional distress,[37] or obstruction of access to property [38] is not pre-empted by the NLRA. But none of those violations of state law involves protected conduct. In contrast, some violations of state trespass laws may be actually protected by § 7 of the federal Act.

In *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S. 105, for example, the Court recognized that in certain circumstances nonemployee union organizers may have a limited right of access to an employer's premises for the purpose of engaging in organization solicitation.[39] And the Court has indicated that *Babcock* extends to § 7 rights other than organizational activity, though the "locus" of the "accommodation of § 7 rights and private property rights . . . may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context." *Hudgens* v. *NLRB,* 424 U. S. 507, 522.

For purpose of analysis we must assume that the Union could have proved that its picketing was, at least in the absence of a trespass, protected by § 7. The remaining question is whether under *Babcock* the trespassory nature of the

---

[35] *Youngdahl* v. *Rainfair, Inc.,* 355 U. S. 131; *Construction Workers* v. *Laburnum,* 347 U. S. 656.

[36] *Linn* v. *Plant Guard Workers,* 383 U. S. 53.

[37] *Farmer* v. *Carpenters,* 430 U. S. 290.

[38] *Automobile Workers* v. *Russell,* 356 U. S. 634.

[39] As the Court stated:

"The employer may not affirmatively interfere with organization; the union may not always insist that the employer aid organization. But when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property has been required to yield to the extent needed to permit communication of information on the right to organize." 351 U. S., at 112.

See also *Central Hardware Co.* v. *NLRB,* 407 U. S. 539.

picketing caused it to forfeit its protected status. Since it cannot be said with certainty that, if the Union had filed an unfair labor practice charge against Sears, the Board would have fixed the locus of the accommodation at the unprotected end of the spectrum, it is indeed "arguable" that the Union's peaceful picketing, though trespassory, was protected. Nevertheless, permitting state courts to evaluate the merits of an argument that certain trespassory activity is protected does not create an unacceptable risk of interference with conduct which the Board, and a court reviewing the Board's decision, would find protected. For while there are unquestionably examples of trespassory union activity in which the question whether it is protected is fairly debatable, experience under the Act teaches that such situations are rare and that a trespass is far more likely to be unprotected than protected.

Experience with trespassory organizational solicitation by nonemployees is instructive in this regard. While *Babcock* indicates that an employer may not always bar nonemployee union organizers from his property, his right to do so remains the general rule. To gain access, the union has the burden of showing that no other reasonable means of communicating its organizational message to the employees exists or that the employer's access rules discriminate against union solicitation.[40] That the burden imposed on the union is a heavy one is evidenced by the fact that the balance struck by the Board and the courts under the *Babcock* accommodation principle has rarely been in favor of trespassory organizational activity.[41]

---

[40] As the Court noted in *Babcock & Wilcox*:

"It is our judgment . . . that an employer may validly post his property against nonemployee distribution of union literature if reasonable efforts by the union through other available channels of communication will enable it to reach the employees with its message and if the employer's notice or order does not discriminate against the union by allowing other distribution." 351 U. S., at 112.

[41] In the absence of discrimination, the union's asserted right of access for organizational activity has generally been denied except in cases involv-

Even on the assumption that picketing to enforce area standards is entitled to the same deference in the *Babcock* accommodation analysis as organizational solicitation,[42] it would be unprotected in most instances. While there does exist some risk that state courts will on occasion enjoin a trespass that the Board would have protected, the significance of this risk is minimized by the fact that in the cases in which the argument in favor of protection is the strongest, the union is likely to invoke the Board's jurisdiction and thereby avoid the state forum. Whatever risk of an erroneous state-court adjudication does exist is outweighed by the anomalous consequence of a rule which would deny the employer access to any forum in which to litigate either the trespass issue or the

---

ing unique obstacles to nontrespassory methods of communication with the employees. See, *e. g.*, *NLRB* v. *S & H Grossinger's, Inc.*, 372 F. 2d 26 (CA2 1967); *NLRB* v. *Lake Superior Lumber Corp.*, 167 F. 2d 147 (CA6 1948).

[42] This assumption, however, is subject to serious question. Indeed, several factors make the argument for protection of trespassory area-standards picketing as a category of conduct less compelling than that for trespassory organizational solicitation. First, the right to organize is at the very core of the purpose for which the NLRA was enacted. Area-standards picketing, in contrast, has only recently been recognized as a § 7 right. *Hod Carriers Local 41* (*Calumet Contractors Assn.*), 133 N. L. R. B. 512 (1961). Second, *Babcock* makes clear that the interests being protected by according limited-access rights to nonemployee, union organizers are not those of the organizers but of the employees located on the employer's property. The Court indicated that "no . . . obligation is owed nonemployee organizers"; any right they may have to solicit on an employer's property is a derivative of the right of that employer's employees to exercise their organization rights effectively. Area-standards picketing, on the other hand, has no such vital link to the employees located on the employer's property. While such picketing may have a beneficial effect on the compensation of those employees, the rationale for protecting area-standards picketing is that a union has a legitimate interest in protecting the wage standards of its members who are employed by competitors of the picketed employer.

protection issue in those cases in which the disputed conduct is least likely to be protected by § 7.

If there is a strong argument that the trespass is protected in a particular case, a union can be expected to respond to an employer demand to depart by filing an unfair labor practice charge; the protection question would then be decided by the agency experienced in accommodating the § 7 rights of unions and the property rights of employers in the context of a labor dispute. But if the argument for protection is so weak that it has virtually no chance of prevailing, a trespassing union would be well advised to avoid the jurisdiction of the Board and to argue that the protected character of its conduct deprives the state court of jurisdiction.

As long as the union has a fair opportunity to present the protection issue to the Labor Board, it retains meaningful protection against the risk of error in a state tribunal. In this case the Union failed to invoke the jurisdiction of the Labor Board,[43] and Sears had no right to invoke that jurisdiction and could not even precipitate its exercise without resort to self-help. Because the assertion of state jurisdiction in a case of this kind does not create a significant risk of prohibition of protected conduct, we are unwilling to presume that Congress intended the arguably protected character of the Union's conduct to deprive the California courts of jurisdiction to entertain Sears' trespass action.[44]

---

[43] Not only could the Union have filed an unfair labor practice charge pursuant to § 8 (a)(1) of the Act at the time Sears demanded that the pickets leave its property, but the Board's jurisdiction could have been invoked and the protection of its remedial powers obtained even after the litigation in the state court had commenced or the state injunction issued. See *Capital Service, Inc.* v. *NLRB*, 347 U. S. 501; *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138.

[44] The fact that Sears demanded that the Union discontinue the trespass before it initiated the trespass action is critical to our holding. While it appears that such a demand was a precondition to commencing a trespass action under California law, see 122 Cal. Rptr. 449 (1975), in order to

The judgment of the Supreme Court of California is therefore reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACKMUN, concurring.

I join the Court's opinion, but add three observations:

1. The problem of a no-man's land in regard to trespassory picketing has been a troubling one in the past because employers have been unable to secure a Labor Board adjudication whether the picketing was "actually protected" under § 7 of the National Labor Relations Act except by resorting to self-help to expel the pickets and thereby inducing the union to file an unfair labor practice charge. The unacceptable possibility of precipitating violence in such a situation called into serious question the practicability there of the *Garmon* preemption test, see *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195, 202 (1970) (WHITE, J., concurring), despite the virtues of the *Garmon* test in ensuring uniform application of the standards of the NLRA.

In this case, however, the NLRB as *amicus curiae* has taken a position that narrows the no-man's land in regard to trespassory picketing, namely, that an employer's mere act of informing nonemployee pickets that they are not permitted

---

avoid a valid claim of pre-emption it would have been required as a matter of federal law in any event.

The Board has taken the position that "a resort to court action . . . does not violate § 8 (a)(1)." *NLRB* v. *Nash-Finch Co., supra,* at 142. If the employer were not required to demand discontinuation of the trespass before proceeding in state court and the Board did not alter its position in cases of this kind, the union would be deprived of an opportunity to present the protection issue to the agency created by Congress to decide such questions. While the union's failure to invoke the Board's jurisdiction should not be a sufficient basis for pre-empting state jurisdiction, the employer should not be permitted to deprive the union of an opportunity to do so.

on his property "would constitute a sufficient interference with rights arguably protected by Section 7 to warrant the General Counsel, had a charge been filed by the Union, in issuing a Section 8 (a)(1) complaint" against the employer. Brief for NLRB as *Amicus Curiae* 18. Hence, if the union, once asked to leave the property, files a § 8 (a)(1) charge, there is a practicable means of getting the issue of trespassory picketing before the Board in a timely fashion without danger of violence.

In this case, as the Court notes, the Union failed to file an unfair labor practice charge after being asked to leave. In such a situation pre-emption cannot sensibly obtain because the "risk of an erroneous state-court adjudication . . . is outweighed by the anomalous consequence of a rule which would deny the employer access to any forum in which to litigate either the trespass issue or the protection issue." *Ante,* at 206–207. It should be made clear, however, that the logical corollary of the Court's reasoning is that if the union *does* file a charge upon being asked by the employer to leave the employer's property and continues to process the charge expeditiously, state-court jurisdiction is pre-empted until such time as the General Counsel declines to issue a complaint or the Board, applying the standards of *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956), rules against the union and holds the picketing to be unprotected. Similarly, if a union timely files a § 8 (a)(1) charge, a state court would be bound to stay any pending injunctive or damages suit brought by the employer until the Board has concluded, or the General Counsel by refusal to issue a complaint has indicated, that the picketing is not protected by § 7. As the Court also notes, *ante,* at 202, the primary-jurisdiction rationale articulated in *Garmon* "unquestionably requires that when the same controversy may be presented to the state court or the NLRB, it must be presented to the Board." Once the no-man's land has been bridged, as it is once a union files a charge, the importance of

deferring to the Labor Board's case-by-case accommodation of employers' property rights and employees' § 7 rights mandates pre-emption of state-court jurisdiction.*

2. The opinion correctly observes, *ante*, at 205, that in implementing this Court's decision in *Babcock* the NLRB only occasionally has found trespassory picketing to be protected under § 7. That observation is important, as is noted,

---

*MR. JUSTICE POWELL's concern, *post*, at 213, that there is an unacceptable delay in waiting for the General Counsel to act is answered in main part by this Court's previous holdings that any obstructive picketing or threatening conduct may be directly regulated by the State. See *Electrical Workers* v. *Wisconsin Employment Relations Bd.*, 315 U. S. 740 (1942); *Youngdahl* v. *Rainfair, Inc.*, 355 U. S. 131 (1957); cf. *Automobile Workers* v. *Russell*, 356 U. S. 634 (1958). There was no hint of such a problem in this case. As the California Supreme Court notes: "It is not disputed that at all times . . . the pickets conducted themselves in a peaceful and orderly fashion. The record discloses no acts of violence, threats of violence, or obstruction of traffic." 17 Cal. 3d 893, 896, 553 P. 2d 603, 606 (1976). There is no claim made that the pickets annoyed members of the public who wished to patronize the store of petitioner Sears; such conduct would be enjoinable, *Youngdahl, supra*, if it had occurred. And, of course, under current NLRB law, pickets would have no right to carry on their activity within a store. *Marshall Field & Co.* v. *NLRB*, 200 F. 2d 375 (CA7 1953). With respect, I do not see what "danger of violence" remains in such a situation, any more than for a business that fronts upon a public sidewalk.

The possibility of delay to which my Brother POWELL adverts is a double-edged sword. The question really is upon whom the burden of delay should be placed. If it takes the General Counsel "weeks" to decide whether to issue a § 8 (a)(1) complaint, by the same token there would be no relief available against an erroneous state-court injunction interfering with protected picketing for an equal length of time. Section 10 (j) permits the Board to seek injunctive relief only after the issuance of a complaint. The Board arguably might seek dissolution of a state-court order under *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138 (1971), but that remedy, too, would encompass some delay. It is worth noting that here by November 12, 1973, the picketing, confined to the public sidewalks by the California Superior Court's temporary restraining order, was abandoned as ineffective. Delay in remedy is desired by neither party in a labor dispute.

*ante,* at 203, in that even the existence of a no-man's land may not justify departure from *Garmon's* pre-emption standard if the exercise of state-court jurisdiction portends frequent interference with actually protected conduct. But in its conclusion that trespassory picketing has been found in "experience under the Act" to be only "rare[ly]" protected and "far more likely to be unprotected than protected," *ante,* at 205, I take the opinion merely to be observing what the Board's past experience has been, not as glossing how the Board must treat the *Babcock* test in the future, either in regard to organizational picketing or other sorts of protected picketing. The *Babcock* test provides that "when the inaccessibility of employees makes ineffective the reasonable attempts by nonemployees to communicate with them through the usual channels, the right to exclude from property [is] required to yield to the extent needed to permit communication of information on the right to organize." 351 U. S., at 112. A variant of that test has been applied by the Board when communication with consumers is at stake. See *Scott Hudgens,* 230 N. L. R. B. 414 (1977). The problem of applying the test in the first instance is delegated to the Board, as part of its "responsibility to adapt the Act to changing patterns of industrial life." *NLRB* v. *Weingarten, Inc.,* 420 U. S. 251, 266 (1975); *Hudgens* v. *NLRB,* 424 U. S. 507, 523 (1976). When, for a number of years, the First Amendment holding of *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), overruled in *Hudgens* v. *NLRB,* diverted the Board from any need to consider trespassory picketing under the statutory test of *Babcock,* it would be unwise to hold the Board confined to its earliest experience in administering the test.

3. The acceptability of permitting state-court jurisdiction over "arguably protected" activities where there is a jurisdictional no-man's land depends, as the Court notes, on whether the exercise of state-court jurisdiction is likely to interfere frequently with actually protected conduct. The

likelihood of such interference will depend in large part on whether the state courts take care to provide an adversary hearing *before* issuing any restraint against union picketing activities. In this case, Sears filed a verified complaint seeking an injunction against the picketing on October 29, 1973. The Superior Court of California entered a temporary restraining order that day. So far as the record reveals, the Union was not accorded a hearing until November 16, on the order to show cause why a preliminary injunction should not be entered. The issue of a prompt hearing was apparently not raised before the Superior Court and was not raised on appeal, and hence does not enter into our judgment here approving the exercise of state-court jurisdiction. But it may be remiss not to observe that in labor-management relations, where *ex parte* proceedings historically were abused, see F. Frankfurter & N. Greene, The Labor Injunction 60, 64–66 (1930), it is critical that the state courts provide a prompt adversary hearing, preferably before any restraint issues and in all events within a few days thereafter, on the merits of the § 7 protection question. Labor disputes are frequently short lived, and a temporary restraining order issued upon *ex parte* application may, if in error, render the eventual finding of § 7 protection a hollow vindication.

MR. JUSTICE POWELL, concurring.

Although I join the Court's opinion, MR. JUSTICE BLACKMUN's concurrence prompts me to add a word as to the "no-man's land" discussion with respect to trespassory picketing. MR. JUSTICE BLACKMUN, relying on the *amicus* brief of the National Labor Relations Board, observes that "there is a practicable means of getting the issue of trespassory picketing before the Board in a timely fashion without danger of violence," *ante,* at 209, if the union—having been requested to leave the property—files a § 8 (a)(1) charge.

With all respect, this optimistic view overlooks the realities of the situation. Trespass upon private property by pickets,

to a greater degree than isolated trespass, is usually organized, sustained, and sometimes obstructive—without initial violence—of the target business and annoying to members of the public who wish to patronize that business. The "danger of violence" is inherent in many—though certainly not all—situations of sustained trespassory picketing. One cannot predict whether or when it may occur, or its degree. It is because of these factors that, absent the availability of an equivalent remedy under the National Labor Relations Act, a state court should have the authority to protect the public and private interests by granting preliminary relief.

In the context of trespassory picketing not otherwise violative of the Act, the Board has no comparable authority. If a § 8 (a)(1) charge is filed, nothing is likely to happen "in a timely fashion." The Board cannot issue, or obtain from the federal courts, a restraining order directed at the picketing. And it may take weeks for the General Counsel to decide whether to issue a complaint. Meanwhile, the "no-man's land" prevents all recourse to the courts, and is an open invitation to self-help. I am unwilling to believe that Congress intended, by its silence in the Act, to create a situation where there is no forum to which the parties may turn for orderly interim relief in the face of a potentially explosive situation.*

---

*It is true that under this Court's decisions, state courts are not precluded from providing relief against actual or threatened violence. But in light of the "danger of violence" inherent in many instances of sustained trespassory picketing, relief often may come too late to prevent interference with the operation of the target business. Cf. *People* v. *Bush*, 39 N. Y. 2d 529, 349 N. E. 2d 832 (1976). Moreover, as Mr. Justice Clark noted for the Court in *Linn* v. *Plant Guard Workers*, 383 U. S. 53, 64 n. 6 (1966), "[t]he fact that the Board has no authority to grant effective relief aggravates the State's concern since the refusal to redress an otherwise actionable wrong creates disrespect for the law and encourages the victim to take matters into his own hands." The "imminent threat of violence [that] exists whenever an employer is required to resort to self-help in order to vindicate his property rights," has prompted at least one state court to retain jurisdiction to enjoin trespassory picket-

I do not minimize the possibility that the Board may find that trespassory activity under certain circumstances is necessary to facilitate the exercise of § 7 rights by employees of the target employer. See *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956); *Central Hardware Co.* v. *NLRB,* 407 U. S. 539 (1972). The Union's conduct in this case, however, involved a publicity campaign maintained by nonemployees and directed at the general public. Such "area standards" trespassory picketing is certainly not at the core of the Act's protective ambit. In any event, it is open to the Board upon the issuance of a complaint to seek temporary relief under § 10 (j) of the Act, 29 U. S. C. § 160 (j), against the employer's interference with § 7 rights. Cf. *Capital Service, Inc.* v. *NLRB,* 347 U. S. 501 (1954). Moreover, it is not an unreasonable assumption that state courts will be mindful of the determination of an expert federal agency that there is probable cause to believe that conduct restrained by state process is protected under the Act. But I find no warrant in the Act to compel the employer to endure the creation, especially by nonemployees, of a temporary easement on his property pending the outcome of the General Counsel's action on a charge.

In sum, I do not agree with MR. JUSTICE BLACKMUN that "the logical corollary of the Court's reasoning" in its opinion today is that state-court jurisdiction is pre-empted forthwith upon the filing of a charge by the union. I would not join the Court's opinion if I thought it fairly could be read to that effect.

MR. JUSTICE BRENNAN, with whom MR. JUSTICE STEWART and MR. JUSTICE MARSHALL join, dissenting.

The Court concedes that both the objective and the location of the Union's peaceful, nonobstructive picketing of

---

ing even after the filing of an unfair labor practice charge with the Board. *May Department Stores Co.* v. *Teamsters,* 64 Ill. 2d 153, 162–163, 355 N. E. 2d 7, 10–11 (1976).

Sears' store may have been protected under the National Labor Relations Act.[1] Therefore, despite the Court's transparent effort to disguise it, faithful application of the principles of labor law pre-emption established in *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959),[2] would compel the conclusion that the California Superior Court was powerless to enjoin the Union from picketing on Sears' property: that the trespass was arguably protected is determinative of the state court's lack of jurisdiction, whether or not pre-emption limits an employer's remedies. See *Longshoremen* v. *Ariadne Shipping Co.,* 397 U. S. 195, 200–201 (1970); *Garmon, supra; Meat Cutters* v. *Fairlawn Meats, Inc.,* 353 U. S. 20 (1957); *Guss* v. *Utah Labor Relations Bd.,* 353 U. S. 1 (1957).[3]

By holding that the arguably protected character of union activity will no longer be sufficient to pre-empt state-court jurisdiction, the Court creates an exception of indeterminate dimensions to a principle of labor law pre-emption that has been followed for at least two decades. Now, when the em-

---

[1] See *infra,* at 225–226.

[2] *Garmon* announced the following test of labor law pre-emption:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the [Act] or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield. . . . [And] [w]hen an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." 359 U. S., at 244–245.

This rule, which was implicit in earlier decisions, has been repeatedly reaffirmed. See, *e. g., Farmer* v. *Carpenters,* 430 U. S. 290 (1977); *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132, 138–139 (1976); *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274 (1971).

[3] Although the Court also misapplies the "arguably prohibited" prong of the *Garmon* test, see n. 12, *infra,* I concentrate on its modification of the "arguably *protected*" prong because this aspect of the decision has far greater significance.

ployer lacks a "reasonable opportunity" to have the Board consider whether the challenged *aspect* of the employee conduct is protected and when employees having that opportunity have not invoked the Board's jurisdiction, a state court will have jurisdiction to enjoin arguably protected activity if the "risk of an erroneous . . . adjudication [by it does not outweigh] the anomalous consequence [of denying a remedy to the employer]." *Ante,* at 206. In making this rather amorphous determination, the lower courts apparently are to consider the strength of the argument that § 7 in fact protects the arguably protected activity, their own assessments of their ability correctly to determine the underlying labor law issue, and the strength of the state interest in affording the employer an opportunity to have a state court restrain the arguably protected conduct.

This drastic abridgment of established principles is unjustified and unjustifiable. The *Garmon* test, itself fashioned after some 15 years of judicial experience with jurisdictional conflicts that threatened national labor policy, see *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274, 290–291 (1971), has provided stability and predictability to a particularly complex area of the law for nearly 20 years. Thus, the most elementary notions of *stare decisis* dictate that the test be reconsidered only upon a compelling showing, based on actual experience, that the test disserves important interests. Emphatically, that showing has not been and cannot be made. Rather, the *Garmon* test has proved to embody an entirely acceptable, and probably the best possible, accommodation of the competing state-federal interests. That an employer's remedies in consequence may be limited, while anomalous to the Court, produces no positive social harm; on the contrary, the limitation on employer remedies is fully justified both by the ease of application of the test by thousands of state and federal judges and by its effect of averting the danger that state courts may interfere with national labor policy. In

sharp contrast, today's decision creates the certain prospect of state-court interference that may seriously erode § 7's protections of labor activities.  Indeed, the most serious objection to the decision today is not that it is contrary to the teachings of *stare decisis* but rather that the Court's attempt to create a narrow exception to the principles of *Garmon* promises to be applied by the lower courts so as to disserve the interests protected by the national labor laws.

## I

It is appropriate to recall the considerations that have shaped the development of the doctrine of labor law preemption.  The National Labor Relations Act (Act), of course, changed the substantive law of labor relations.  Prior to its enactment many courts treated concerted labor activities of employees as tortious conspiracies or restraints of trade to be enjoined unless the activities related to a specific benefit sought by the employees from their employer; activity directed at strengthening the union was, for these courts, impermissible.  See F. Frankfurter & N. Greene, The Labor Injunction 26–29 (1930) (hereafter Frankfurter & Greene).  While some courts regarded peaceful picketing as permissible if intended to attain lawful objectives, others regarded picketing as always enjoinable.  *Id.,* at 30–46.  Section 7 abrogated these state laws.  It declares that "concerted activities for the purpose of collective bargaining or other mutual aid or protection," including specific types and forms of picketing, are protected from interference from any source.  Section 7 further provides that employers no longer have an absolute right to prohibit concerted activities occurring on their properties; unwilling employers frequently are required to suffer the presence of organizational activities on their premises.  See *NLRB* v. *Magnavox Co.,* 415 U. S. 322 (1974); *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956); *Republic Aviation Corp.* v. *NLRB,* 324 U. S. 793 (1945).

But the Act did more than displace certain state laws. Section 8 (a) of the Act declares that it is an unfair labor practice for an employer to interfere with employee exercise of § 7 rights, and § 8 (b) of the Act provides that certain forms of employee activity, including several types of picketing, are unfair labor practices. Congress created the National Labor Relations Board to administer these provisions and prescribed a detailed procedure for the imposition of restraint on any conduct that is violative of the Act: charge and complaint, notice and hearing, and an order pending judicial review.

The animating force behind the doctrine of labor law preemption has been the recognition that nothing could more fully serve to defeat the purposes of the Act than to permit state and federal courts, without any limitation, to exercise jurisdiction over activities that are subject to regulation by the National Labor Relations Board. See *Motor Coach Employees* v. *Lockridge, supra,* at 286. Congress created the centralized expert agency to administer the Act because of its conviction—generated by the historic abuses of the labor injunction, see Frankfurter & Greene—that the judicial attitudes, court procedures, and traditional judicial remedies, state and federal, were as likely to produce adjudications incompatible with national labor policy as were different rules of substantive law. See *Garner* v. *Teamsters,* 346 U. S. 485, 490–491 (1953). Although Congress could not be understood as having displaced "all local regulation that touches or concerns in any way the complex interrelationships between employers, employees, and unions," *Motor Coach Employees* v. *Lockridge, supra,* at 289, the legislative scheme clearly embodies an implicit prohibition of those state- and federal-court adjudications that might significantly interfere with those interests that are a central concern to national labor policy.

The Act's treatment of picketing illustrates the nature of the generic problem, and at the same time highlights the issue in this case. While this Court has never held that the prescrip-

tion of detailed procedures for the restraint of specific types of picketing and the provision that other types of picketing are protected implies that picketing is to be free from all restraint under state law, see, *e. g., Automobile Workers* v. *Russell,* 356 U. S. 634 (1958) (state courts may restrain violent conduct on picket lines), it by the same token necessarily is true that to permit local adjudications, without limitation, of the legality of picketing would threaten intolerable interference with the interests protected by the Act. As the Court recognizes, the nature of the threatened interference differs depending on whether the picketing implicates the Act's prohibitions or its protections. See *ante,* at 190. As to arguably prohibited picketing, there is a risk that the state court might misinterpret or misapply the federal prohibition and restrain conduct that Congress may have intended to be free from governmental restraint.[4] But even when state courts can be depended upon accurately to determine whether conduct is in fact prohibited, local adjudication may disrupt the congressional scheme by resulting in different forms of relief than would adjudication by the NLRB. By providing that an expert, centralized agency would administer the Act, Congress quite plainly evidenced an intention that, ordinarily at least, this expert agency should, on the basis of its experience with labor matters, determine the remedial implications of violations of the Act. If state courts were permitted to administer all the Act's prohibitions, the divergences in relief would add up to significant departures from federal policy. These considerations led the Court to fashion the rule, announced in *Garmon,* 359 U. S., at 245, that

---

[4] One danger, of course, is that a state court's misinterpretation of the federal prohibition may result in restraining conduct that in fact is protected by the Act. The "arguably protected" prong of *Garmon* addresses this risk. A second danger is that the state court's misconception or misapplication of the law may result in the imposition of restraints on conduct that is neither protected nor prohibited by the Act, but which Congress intended to be free from government control. See *Machinists* v. *Wisconsin Employment Relations Comm'n,* 427 U. S. 132 (1976).

state courts have no jurisdiction over "arguably prohibited" conduct.

This aspect of *Garmon* has never operated as a flat prohibition.[5] There are circumstances in which state courts can be depended upon accurately to determine whether the underlying conduct is prohibited and in which Congress cannot be assumed to have intended to oust state-court jurisdiction. Illustrative are decisions holding that States may regulate mass picketing, obstructive picketing, or picketing that threatens or results in violence. See *Automobile Workers* v. *Russell, supra; Automobile Workers* v. *Wisconsin Employment Relations Bd.,* 351 U. S. 266 (1956); *Construction Workers* v. *Laburnum Constr. Corp.,* 347 U. S. 656 (1954); *Electrical Workers* v. *Wisconsin Employment Relations Bd.,* 315 U. S. 740, 749 (1942). Because violent tortious conduct on a picket line is prohibited by § 8 (b) and because state courts can reliably determine whether such conduct has occurred without considering the merits of the underlying labor dispute, allowing local adjudications of these tort actions could neither fetter the exercise of rights protected by the Act nor otherwise interfere with the effective administration of the federal scheme. And the possible inconsistency of remedy is not alone a sufficient reason for pre-empting state-court jurisdic-

---

[5] There are several arguably discrete exceptions to *Garmon,* all sharing a common characteristic. Each applies only in circumstances in which local adjudications will not threaten important interests protected by the Act: *e. g.,* when a state court can ascertain the actual legal significance of particular conduct by reference to "compelling precedent applied to essentially undisputed facts," *Garmon,* 359 U. S., at 246; when the rule to be invoked before the state tribunal is "so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the [Act]," *Motor Coach Employees* v. *Lockridge,* 403 U. S., at 297–298; "where the activity regulated was merely a peripheral concern of the [Act or] . . . touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act." *Garmon, supra,* at 243–244.

tion. In view of the historic state interest in "such traditionally local matters as public safety and order," *Electrical Workers* v. *Wisconsin Employment Relations Bd., supra,* at 749, the Act could not, in the absence of a clear statement to the contrary, be construed as precluding the imposition of different, even harsher, state remedies in such cases. See *Automobile Workers* v. *Russell, supra,* at 641–642. Indeed, in view of the delay attendant upon resort to the Board, it could well produce positive harm to prohibit state jurisdiction in these circumstances. Our decisions leave no doubt that exceptions to the *Garmon* principle are to be recognized only in comparable circumstances. See *Farmer* v. *Carpenters,* 430 U. S. 290, 297–301 (1977); *Vaca* v. *Sipes,* 386 U. S. 171 (1967); *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966).

When, on the other hand, the underlying conduct may be *protected* by the Act, the risk of interference with the federal scheme is of a different character. The danger of permitting local adjudications is not that timing or form of relief might be different from what the Board would administer, but rather that the local court might restrain conduct that is in fact protected by the Act. This might result not merely from attitudinal differences but even more from unfair procedures or lack of expertise in labor relations matters. The present case illustrates both the nature and magnitude of the danger. Because the location of employee picketing is often determinative of the meaningfulness of the employees' ability to engage in effective communication with their intended audience, employees often have the right to engage in picketing at particular locations, including the private property of another. See *Hudgens* v. *NLRB,* 424 U. S. 507 (1976); *Scott Hudgens,* 230 N. L. R. B. 414, 95 LRRM 1351 (1977); cf. *NLRB v. Babcock & Wilcox Co.,* 351 U. S. 105 (1956). The California Superior Court here entered an order, *ex parte,* broad enough to prohibit all effective picketing of Sears' store for a period of 35 days. See opinion of my Brother BLACKMUN, *ante,* at 212.

Since labor disputes are usually short lived, see *ibid.*, this possibly erroneous order may well have irreparably altered the balance of the competing economic forces by prohibiting the Union's use of a permissible economic weapon at a crucial time. Obviously it is not lightly to be inferred that a Congress that provided elaborate procedures for restraint of prohibited picketing and that failed to provide an employer with a remedy against otherwise unprotected picketing could have contemplated that local tribunals with histories of insensitivity to the organizational interests of employees be permitted effectively to enjoin protected picketing.

In recognition of this fact, this Court's efforts in the area of labor law pre-emption have been largely directed to developing durable principles to ensure that local tribunals not be in a position to restrain protected conduct. Because the Court today appears to have forgotten some of the lessons of history, it is appropriate to summarize this Court's efforts. The first approach to be tried—and abandoned—was for this Court to proceed on a case-by-case basis and determine whether each particular final state-court ruling "does, or might reasonably be thought to, conflict in some relevant manner with federal labor policy," *Motor Coach Employees* v. *Lockridge,* 403 U. S., at 289–291; see *Automobile Workers* v. *Wisconsin Employment Relations Bd.,* 336 U. S. 245 (1949). Not surprisingly, such an effort proved institutionally impossible. Because of the infinite combinations of events that implicate the central protections of the Act, this Court could not, without largely abdicating its other responsibilities, hope to determine on an ad hoc, generic-situation-by-generic-situation basis whether applications of state laws threatened national labor policy. In any case, such an approach necessarily disserved national labor policy because decision by this Court came too late to repair the damage that an erroneous decision would do to the congressionally established balance of power and was no substitute for decision in the first instance by the Board. The

Court soon concluded that protecting national labor policy from disruption or defeat by conflicting local adjudications demanded broad principles of labor law pre-emption, easily administered by state and federal courts throughout the Nation, that would minimize, if not eliminate entirely, the possibility of decisions of local tribunals that irreparably injure interests protected by § 7. The only rule [6] satisfying these dual requirements was *Garmon*'s flat prohibition: "When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the . . . Board." 359 U. S., at 245.

While there is some unavoidable uncertainty concerning the arguably *prohibited* prong of *Garmon*, I emphasize that it has heretofore been absolutely clear that there is no state power to deal with conduct that is a central concern of the Act [7] and arguably *protected* by it, see *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195 (1970); *Garmon, supra; Meat Cutters* v. *Fairlawn Meats, Inc.*, 353 U. S. 20 (1957); *Guss* v. *Utah Labor Relations Bd.*, 353 U. S. 1 (1957). As the Court itself recognizes, see *ante*, at 194–197 and 204, none of the *Garmon* exceptions have ever been or could ever be applied to local attempts to restrain such conduct. But the *Garmon* approach to "arguably protected" activity does not "swee[p] away state-court jurisdiction over conduct traditionally subject to

---

[6] A second approach was suggested and rejected by *Garmon* itself: that state-court jurisdiction be pre-empted only when "it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the . . . Act." 359 U. S., at 244. This Court recognized that state and federal courts, quite simply, lack the familiarity and requisite sensitivity to labor law matters to be counted on accurately to determine which combinations of facts could "fairly be assumed" to fall within the ambit of § 7.

[7] If an activity were merely a "peripheral concern" of the Act, state and federal courts presumably may restrain it even if arguably protected. See *Garmon*, 359 U. S., at 246.

state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected." *Ante,* at 188. Quite the contrary, such careful consideration is subsumed by the determination whether the underlying conduct may be protected by § 7. By enacting § 7, Congress necessarily intended to pre-empt certain state laws: *e. g.,* those prohibiting concerted activities as conspiracies or unlawful restraints of trade. In any instance in which it can seriously be maintained that the congressionally established scheme protects the employee activity, the assessment of the relative weight of the competing state and federal interests has to be regarded as having been made by Congress. By drafting the statute so as to permit a Board determination that the underlying conduct is in fact within the ambit of § 7's protections, Congress necessarily indicated its view that the historic state interest in regulating the conduct, however defined, may have to yield to the attainment of other objectives and that the state interest thus must be regarded as less than compelling. And, of course, there is necessarily a possibility that to permit state-court jurisdiction over arguably protected conduct could fetter the exercise of rights protected by the Act and otherwise interfere with the congressional scheme. A local tribunal could recognize an activity as arguably protected, yet, given its attitude toward organized labor, lack of expertise in labor matters, and insensitive procedures, misapply or misconceive the Board's decisional criteria and restrain conduct that is within the ambit of § 7.

## II

The present case illustrates both the necessity of this flat rule and the danger of even the slightest deviation from it. The present case, of course, is a classic one for pre-emption. The question submitted to the state court was whether the Union had a protected right to locate peaceful nonobstructive pickets on the privately owned walkway adjacent to Sears'

retail store or on the privately owned parking lot a few feet away.

## A

That the trespass was arguably protected could scarcely be clearer. *NLRB* v. *Babcock & Wilcox Co.*, 351 U. S., at 112, indicates that trespassory § 7 activity is protected when "reasonable efforts . . . through other available channels" will not enable the union to reach its intended audience. This standard, which was developed in the context of a rather different factual situation, is but an application of more general principles. "[T]he basic objective under the Act [is the] accommodation of § 7 rights and private property rights 'with as little destruction of one as is consistent with the maintenance of the other.' The locus of that accommodation, however, may fall at differing points along the spectrum depending on the nature and strength of the respective § 7 rights and private property rights asserted in any given context." *Hudgens* v. *NLRB*, 424 U. S., at 522, quoting *NLRB* v. *Babcock & Wilcox Co.*, *supra*, at 112; see *Scott Hudgens*, 230 N. L. R. B., at 417, 95 LRRM, at 1354.

Here, it can seriously be contended that the locus of the accommodation should be on the side of permitting the trespass. The § 7 interest is strong: The object of the picketing was arguably protected on one of two theories—as "area standards"[8] or as "recognitional"[9] picketing—and the record suggests that the relocation of the picketing to the nearest public area—a public sidewalk 150 to 200 feet away—may have so

---

[8] See *Longshoremen* v. *Ariadne Shipping Co.*, 397 U. S. 195 (1970).

[9] The Act provides that recognitional picketing is prohibited if no representation petition is filed within a reasonable time, not to exceed 30 days. See *ante*, at 186, and n. 10. Although the Board has never held that recognitional picketing is *protected* at the outset and for up to 30 days thereafter, this conclusion would seem to follow from its holding that "area standards" picketing is protected. See *Hod Carriers* (*Calumet Contractors Assn.*), 133 N. L. R. B. 512 (1961).

diluted the picketing's impact as to make it virtually meaningless.[10]   The private property interest, in contrast, was exceedingly weak.   The picketing was confined to a portion of Sears' property which was open to the public and on which Sears had permitted solicitations by other groups.[11]   Thus, while Sears to be sure owned the property, it resembled public property in many respects.   Indeed, while Sears' legal position would have been quite different if the lot and walkways had been owned by the city of Chula Vista, it is doubtful that Sears would have been any less angered or upset by the picketing if the property had in fact been public.

But the Court refuses to follow the simple analysis that has been sanctioned by the decisions of the last 20 years.   Its reasons for discarding prior teachings, apparently, is a belief that faithful application of *Garmon* to the generic situation presented by this case causes positive social harm.   I disagree.

It bears emphasizing that *Garmon* only partially pre-empts an employer's remedies against unlawful trespassory picketing. A state court may, of course, enjoin any picketing that is clearly unprotected by the Act: *e. g.*, peaceful, nonobstructive picketing occurring within a retail store.   See Brief for Respondent 30 n. 14, citing *NLRB* v. *Fansteel Corp.*, 306 U. S. 240 (1939); *Marshall Field & Co.* v. *NLRB*, 200 F. 2d 375 (CA7 1953); Brief for NLRB as *Amicus Curiae* 15 n. 9.   And, as already indicated, state courts have jurisdiction over picket-

---

[10] Although the matter is disputed, a Union representative testified that picketing from the public sidewalk adjacent to the outer perimeters of Sears' parking lot was totally ineffective and that, for this reason, the California Superior Court's temporary restraining order required the Union to abandon the picketing.   App. 28.

[11] Sears permitted solicitation and distribution of literature on its property in the cases of the Lion's Club white cane drive, the Salvation Army at Christmas time, and the League of Women Voters for voter registration. *Id.*, at 14.   The fact of prior solicitation simply confirms what would have been clear in any case: that the Union picketing was not incompatible with the retail operations.

ing that is obstructive, or involves large groups of persons, or otherwise entails a serious threat of violence. *Automobile Workers* v. *Russell; Construction Workers* v. *Laburnum Constr. Corp.; Automobile Workers* v. *Wisconsin Employment Relations Bd.; Electrical Workers* v. *Wisconsin Employment Relations Bd.* These decisions constitute an almost dispositive answer to my Brother POWELL's suggestion that state trespass laws should be allowed full play, see *ante,* at 213: most of the factual situations that concern him fall within a recognized *Garmon* exception. Finally, an employer may file an unfair labor practice charge under § 8 (b) and obtain a "cease and desist" order from the Board where the picketing has an objective prohibited by § 8 (b).

Thus, pre-emption of state-court jurisdiction to deal with trespassory picketing has been largely, if not entirely, confined to situations such as presented in this case, *i. e.,* in which the interest of the employer in preventing the picketing is weak, the § 7 interest in picketing on the employer's property strong, and the picketing peaceful and nonobstructive. In this circumstance, I think the denial to the employer of a remedy is an entirely acceptable social cost for the benefits of a pre-emption rule that avoids the danger of state-court interference with national labor policy. The Court's arguments to the contrary are singularly unpersuasive. Because an employer's remedies are only pre-empted in the narrow circumstances of a case such as the present one, any suggestion that the faithful application of *Garmon* creates a "no-man's land" which results in a substantial risk of violence, see opinion of my Brother BLACKMUN, *ante,* at 208; opinion of my Brother POWELL, *ante,* at 213; cf. opinion of the Court, *ante,* at 202, can be dismissed as the most unfounded speculation. An employer like Sears may be angered or outraged by the presence of peaceful, nonobstructive picketing close to its retail store. But the Act requires the employer's toleration of peaceful picketing when § 7 affords the union the right to engage in this form of

economic pressure. There is simply no basis whatsoever for a conclusion that the risk of violence is any greater when an employer is told by a state court that *Garmon* bars his state trespass action than when he is told either that § 7 protects picketing on a public area immediately adjacent to his business, cf. *Longshoremen* v. *Ariadne Shipping Co.,* or that § 7 in fact privileges the entry onto his property. Cf. *Scott Hudgens.*

In apparent recognition of this indisputable fact, the Court places no great reliance on the likelihood of violence. But the only other reason advanced for a conclusion that *Garmon* produces socially intolerable results is that it is "anomalous" to deny an employer a trespass remedy. Since the Act extensively regulates the conditions under which an employer's proprietary rights must yield to the exercise of § 7 rights, I am at a loss as to why the anomaly here is any greater than that which results from the pre-emption of state remedies against tortious conspiracies, compare § 7 of the Act with Frankfurter & Greene 26–39, or from the pre-emption of state remedies against nonmalicious libels. See *Linn* v. *Plant Guard Workers,* 383 U. S. 53 (1966).

## B

That this Court's departure from *Garmon* creates a great risk that protected picketing will be enjoined is amply illustrated by the facts of this case and by the task that was assigned to the California Superior Court. To decide whether the location of the Union's picketing rendered it unlawful, the state court here had to address a host of exceedingly complex labor law questions, which implicated nearly every aspect of the Union's labor dispute with Sears and which were uniquely within the province of the Board. Because it had to assess the "relative strength of the § 7 right," see *Hudgens* v. *NLRB,* 424 U. S., at 522, its first task necessarily was to determine the nature of the Union's picketing. This picketing could have

been characterized in one of three ways: as protected area-standards picketing, see opinion of the Court, *ante,* at 186–187; as prohibited picketing to compel a reassignment of work, see *ante,* at 185–186, and n. 9; or as recognitional picketing that is protected at the outset but prohibited if no petition for a representative election is filed within a reasonable time, not to exceed 30 days. See *supra,* at 225 n. 9; *ante,* at 186, and n. 10. Notably, if the state court concluded that the picketing was prohibited by § 8 (b) (4)—or unprotected by § 7 on any other theory—that determination would have been conclusive against respondent: Whether or not the state court agreed with the Union's contention that effective communication required that picketing be located on Sears' premises, the court would enjoin the trespassory picketing on the ground that no protected § 7 interest was involved. Obviously, since even the Court admits that the characterization of the picketing "entail[s] relatively complex factual and legal determinations," see *ante,* at 198, there is a substantial danger that the state court, lacking the Board's expertise and specialized sensitivity to labor relations matters, would err at the outset and effectively deny respondent the right to engage in any effective § 7 communication.[12]

But even if the state court correctly assesses the § 7 interest, there are a host of other pitfalls. A myriad of factors are or

---

[12] Since the whole premise for an order effectively terminating all picketing of the Sears store could be the state court's conclusion that the picketing was prohibited by § 8 (b), it is difficult to understand how the Court can assert that this is a case in which the "arguably prohibited" prong of the *Garmon* test is not implicated. Even if the Court is correct that the crucial consideration under that aspect of *Garmon* is whether the controversy in the state court would be the same as that which would have been presented to the NLRB, see *ante,* at 197, the test surely is satisfied here. More fundamentally, to permit a state court to enter an order which, in law and fact, prohibits picketing because of an interpretation of § 8 (b) entails a substantial risk of interference with the objectives Congress sought to achieve by giving the Board exclusive jurisdiction to enforce § 8 (b).

could be relevant to determining whether § 7 protected the trespass: *e. g.,* whether and to what extent relocating the picketing on the nearest public property 150 feet away would have diluted its impact; whether the picketing was character- ized as recognitional or area standards; whether or the extent to which Sears had opened the property up to the public or permitted similar solicitation on it; whether it mattered that the pickets did not work for Sears, etc. And if relevant, each of these factors would suggest a number of subsidiary inquiries.

It simply cannot be seriously contended that the thousands of judges, state and federal, throughout the United States can be counted upon accurately to identify the relevant considera- tions and give each the proper weight in accommodating the respective rights. Indeed, the actions of the California courts illustrate the danger. Not only was the *ex parte* order of the California Superior Court entered under conditions precluding careful consideration of all relevant considerations, even the Court of Appeal, presumably able to devote more time and deliberation to isolate the correct decisional criteria, failed properly to appreciate the significance of a criterion critical to the application of national law: that the distance of the picketing from a store entrance is largely determinative of its effectiveness. Cf. *Scott Hudgens,* 230 N. L. R. B., at 417, 95 LRRM, at 1354 ("a message announced . . . by picket sign . . . a [substantial] distance from the focal point would be too greatly diluted to be meaningful"). Nothing better demon- strates the wisdom of the heretofore settled rule that "the primary responsibility for making [the] accommodation [be- tween § 7 rights and private property rights] must rest with the Board in the first instance." *Hudgens* v. *NLRB, supra,* at 522.

The Court does not deny that its decision may well result in state-court decisions erroneously prohibiting or curtailing conduct in fact protected by § 7. But it identifies two con-

siderations that persuade it that the risk of interference is minimal and that, in any case, the risk does not outweigh the anomalous consequence of denying the employer a remedy.

The first is its belief that the generic type of activity—which the Court characterizes as trespassory organizational activity by nonemployees—is more likely to be unprotected than protected. *Ante,* at 205–206. In so concluding, the Court relies on *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105 (1956), for the proposition that there is a strong presumption against permitting trespasses by nonemployees. But the Court overlooks a critical distinction between *Babcock* and the case at bar. *Babcock* involved a trespass on industrial property which the employer had fenced off from the public at large, and it is a grave error to treat *Babcock* as having substantial implications for the generic situation presented by this case. To permit trespassory § 7 activities in the *Babcock* fact pattern entails far greater interference with an employer's business than does allowing peaceful nonobstructive picketing on a parking lot which is open to the public and which has been used for other types of solicitation. As my Brother BLACKMUN's concurring opinion notes, this Court's short-lived holding that picketing at shopping centers is protected by the Fourteenth Amendment, see *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), overruled in *Hudgens* v. *NLRB,. supra,* has resulted in a situation where neither this Court nor the Board has considered, in any comprehensive fashion, the quite different question of the conditions under which union representatives may enter privately owned areas of shopping centers to engage in protected activities such as peaceful picketing. But the Court's own opinion in *Hudgens* v. *NLRB, supra,* and the Board's decision in *Scott Hudgens, supra,*[13] both suggest that

---

[13] In *Scott Hudgens,* the Board held that warehouse employees of a shoe company had a § 7 right to engage in protected picketing on a privately owned shopping mall that contained one of the shoe company's retail outlets. Since the warehouse employees were no more "rightfully

trespasses in such circumstances will often be protected. Quite apart from the fact the Court has no basis for blithely assuming that all private property is fungible, that this Court would fail to appreciate so possibly vital a distinction in assessing the strength of a § 7 claim illustrates the danger of permitting lower courts, which lack even this Court's exposure to labor law, to rule on the question whether trespassory picketing by nonemployees is protected.

The Court's second reason is more problematic still. It urges that the risk that local adjudications will interfere with protected § 7 activity is "minimized by the fact that in the cases in which the argument in favor of protection is the strongest, the union is likely to invoke the Board's jurisdiction and thereby avoid the state forum." *Ante*, at 206. That, with all respect, betrays ignorance of the conduct of adversaries in the real world of labor disputes. Whether a union will seek the protection of a Board order will depend upon whether that tactic will best serve its self-interest, and that determination will depend in turn on whether the employer's request inhibits or interferes with the union's ability to engage in protected conduct. A request that a trespass cease may or may not so threaten the union as to lead it to go to the trouble and expense of attempting to invoke the Board's jurisdiction, and the strength of the argument that the conduct is protected will frequently be a factor of no relevance. For example, if the union perceives the employer's request as a hollow threat or believes that the employer's legal position in any case has no merit, the union will have no reason to turn to the Board.

It might, on the other hand, be the case that the union

---

on the employer's premises" than were the pickets in the present case, see *Hudgens* v. *NLRB*, 424 U. S., at 521–522, n. 10, *Scott Hudgens* at least indicates that the fact that an individual has no right to be on the premises is not a factor of any special significance in the context of shopping center picketing. It would be a small step to conclude that the fact the pickets were nonemployees did not, standing alone at least, counsel strongly against a finding that the trespass was unprotected.

would have more of an incentive to file a § 8 (a)(1) charge if it believed that resort to the Board were necessary to protect itself against adjudications by hostile state tribunals. Of course, even then, the union may not believe that invocation of the Board's jurisdiction is worth the trouble and expense in those instances in which it believes its own legal position unassailable. But there is no point in conjecturing on this score. The Court assiduously avoids holding that resort to the Board will oust a state court's jurisdiction [14] and is divided on this question. Compare opinion of my Brother BLACKMUN, *ante,* at 208–210, with opinion of my Brother POWELL, *ante,* p. 212. The Court cannot have it both ways: Unless and until the Court decides that the filing of a charge pre-empts adjudications by local tribunals, speculation as to the conditions under which there would or would not be a failure to file is an idle exercise.[15]

---

[14] The Court leaves open a host of questions concerning the availability of state-court remedies to the precise type of trespassory picketing that here occurred: Is state-court jurisdiction pre-empted when a § 8 (a)(1) charge is filed before the institution of state suit? What if the § 8 (a)(1) charge is filed after the employer files the state-court complaint, or after the state court has issued temporary, preliminary, or final relief; must the state-court action and state-court order be stayed pending the Board proceedings or is it up to the Board to take action to protect its jurisdiction? Since the generic situation is one in which there is no realistic possibility of violence, I think my Brother BLACKMUN's logic in answering some of these questions is unassailable, see *ante,* at 208–210. Indeed, I would think the Court would be compelled to extend it to a situation my Brother BLACKMUN does not address: when the state court has entered final relief. But especially in light of my Brother POWELL's differing views, see *ante,* p. 212, it can safely be predicted that the state and federal courts around the country will answer these questions in a variety of ways. A consequence surely will be that erroneous determinations of non-preemption will occur and rights and interests protected by the Act will be irreparably damaged before any corrective action can be taken by this Court.

[15] It should be apparent that to require employees to file § 8 (a)(1) charges to avoid hostile local adjudications itself would entail a certain

## III

But what is far more disturbing than the specific holding in this case is its implications for different generic situations. Whatever the shortcomings of *Garmon,* none can deny the necessity for a rule in this complex area that is capable of uniform application by the lower courts. The Court's new exception to *Garmon* cannot be expected to be correctly applied by those courts and thus most inevitably will threaten erosion of the goal of uniform administration of the national labor laws. Even though the Court apparently intends to create only a very narrow exception to *Garmon*—largely if not entirely limited to situations in which the employer first requested the nonemployees engaged in area-standards picketing on the employer's property to remove the pickets from the employer's land and the union did not respond by filing § 8 (a)(1) unfair labor practice charges—the approach the Court today adopts cannot be so easily cabined and thus threatens intolerable disruption of national labor policy.

Because § 8 (b) only affords an employer a remedy against certain types of unprotected employee activity, there necessarily will be a myriad of circumstances in which an employer will be confronted with possibly unprotected employee or union conduct, and yet be unable directly to invoke the Board's processes to receive a determination of the protected

disruption of the congressional scheme. Section 8 (a)(1) was intended to afford employees a remedy in those circumstances in which they felt it was in their self-interest to seek protection by the Board. Congress by the same token plainly intended not to afford employers a remedy before the Board whenever they were confronted with arguably unprotected conduct. If the Court takes the position that employees can avoid hostile state-court adjudications of their rights only by filing § 8 (a)(1) charges whenever employers threaten interference with arguably protected activity, the effect would be to stand the congressional scheme on its head. The employers would in effect be invoking the Board's jurisdiction under conditions in which the employees have no interest in obtaining the Board's protection.

character of the conduct. Today's decision certainly opens the door to a conclusion by state and federal courts that the Court's new exception applies in any situation where the employer has requested that the labor organization cease what the employer claims is unprotected conduct and the union has not responded by filing a § 8 (a)(1) charge. In that circumstance, today's decision sanctions a three-step process by the state or federal court.

First, the court must inquire whether the employer had a "reasonable opportunity" to force a Board determination. What constitutes a "reasonable opportunity"? I have to assume from today's decision that the employer can never be deemed to have an acceptable opportunity when nonemployees are engaged in the arguably protected activity. But what if employees are involved? Will the fact that the employer can provoke the filing of an unfair labor practice charge by disciplining the employee always constitute an acceptable alternative? Perhaps so, but the Court provides no guidance that can help the local judges. Some may believe that the fact that any discipline will enhance the seriousness of the unfair labor practice renders that course unacceptable. Similarly, what of the instances in which employer discipline might not, under the circumstances, provoke the filing of a charge: *e. g.,* if an economic strike were in progress?

Second, if the lower court concludes that the employer did not have an acceptable means of placing the protection issue before the Board, it must then proceed to inquire whether, in light of its assessment of the strength of the argument that § 7 might protect the generic type of conduct involved, there is a substantial likelihood that its adjudication will be incompatible with national labor policy. This is a particularly onerous task to assign to judges having no special expertise or specialized sensitivity in the application of the federal labor laws, and it is not clairvoyant to predict that many local tribunals will misconceive the relevant criteria and erroneously

conclude that they are capable of correctly applying the labor laws. With all respect, the Court's opinion proves my point. As I have already observed, in concluding that peaceful picketing upon Sears' walkway was more likely to be unprotected than protected, the Court makes an entirely unfounded assumption concerning the approach the Board is likely to apply to the organizational activities of nonemployees at shopping centers. Since the great majority of state and federal judges around the Nation rarely, if ever, have this Court's exposure to the federal labor laws, local tribunals surely will commit far more grievous errors in assessing the likelihood that its adjudication will subvert national labor policy. But the final step in the Court's new pre-emption inquiry is the most troublesome: The range of circumstances in which local tribunals might conclude that the anomaly of denying an employer a remedy outweighs the risk of erroneous determinations by the state courts is limitless. Many erroneous determinations of non-pre-emption are certain to occur, and the local adjudications of the protection issues will inevitably often be inconsistent and contrary to national policy.

This prospect should give the Court more concern than its opinion reflects. It is no answer that errors remain correctible while this Court sits. The burden that will be thrown upon this Court finally to decide, on an ad hoc, generic-situation-by-generic-situation basis, whether the employer had a "reasonable opportunity" to obtain a Board determination and, if not, whether the risk of interference outweighs the anomaly of denying the employer a remedy, should give us pause. Inconsistency and error in decisions below may compel review of an inordinate number of cases, lest lower court adjudications threaten irretrievable injury to interests protected by § 7. Indeed, the experience of 30 years ago should, I would have thought, taught us the folly of such an approach. And our burden will be even greater if, as my Brother BLACKMUN suggests, *ante*, at 211–212, this Court must fashion a code of

"labor law due process" to minimize the risk of erroneous state-court determinations of protection questions.

I do not doubt that this Court could, if it wished, minimize the deleterious consequences of today's unfortunate decision. But the Court cannot prevent it from introducing inconsistency and confusion that will threaten the fabric of national labor policy and from imposing new and unnecessary burdens on this Court. Adherence to *Garmon* would spare us and the Nation these burdens. Because the Court has not demonstrated that *Garmon* produces an unacceptable accommodation of the conflicting state and federal interests, I respectfully dissent.