Cratsley, John C., Fabricant, Judith, Gaziano, Frank M., Js.
INTRODUCTION AND BACKGROUND
This action arises from a labor dispute, within the meaning of G.L.c. 149, §20C, between Verizon Communications, Inc., and the International Brotherhood of Electrical Workers (IBEW, or the Union). Verizon Communications, Inc., has alleged that striking employees in a number of locations in Massachusetts and elsewhere have engaged in unlawful conduct that poses a threat of violence, personal injury, and injury to properly. On that basis, it has filed actions in courts in a number of jurisdictions seeking injunctions to prevent such conduct. [1]
The plaintiff here, Verizon New England, Inc. (Verizon), a subsidiary of Verizon Communications, Inc., filed this action on August 10, 2011. The defendants named in the complaint are System Council T-6, described in the complaint as “an umbrella organization of all IBEW-represented VNE employees”; four IBEW Locals, nos. 2222, 2321, 2322, and 2325; and unidentified individual “members, employees, followers, or supporters” of the named organizations. As of this writing, to the Court’s knowledge no individual defendants have been identified or served.
On August 10, 2011, pursuant to G.L.c. 212, §30, the Chief Justice of the Superior Court appointed the undersigned as a three-judge panel to consider Verizon’s request for injunctive relief pursuant to G.L.c. 214, §6. After notice to all parties, the panel convened a hearing on August 11, 2011, at which time it considered procedural matters, heard evidence on the plaintiffs request for a temporary restraining order, and scheduled an evidentiary hearing on the plaintiffs request for a preliminary injunction to begin on August 12, 2011. Later on August 11, 2011, the Court issued a memorandum of decision and order addressing one narrow aspect of the alleged misconduct temporarily, and enjoining such conduct until August 16, 2011. On that date, by agreement of all parties, the Court extended the temporary restraining order pending decision on the request for preliminary injunction.
Beginning on August 12, 2011, and continuing through some three and one-half court days, ending on the morning of August 17,2011, the Court received evidence, including the testimony of twenty-seven witnesses, and heard arguments of counsel with respect to the factual and legal issues pertinent to the plaintiffs request for a preliminary injunction. Based on the credible evidence presented, the reasonable inferences drawn from that evidence, and authorities cited, the Court finds and rules as follows.
FINDINGS OF FACT
Verizon is a public utility incorporated under the laws of New York with a principal place of business at 125 High Street in Boston. It furnishes communication services to its customers in Massachusetts and Rhode Island. Verizon was a party to a collective bargaining agreement (CBA) effective from August 3, 2008, until August 6, 2011, with employees working in Massachusetts and Rhode Island represented by IBEW Locals 2222, 2313, 2320, 2321, 2322, 2323, 2324 and 2325. Each IBEW Local is the exclusive bargaining representative for Verizon employees in a particular geographic area. In Massachusetts, the Locals represent employees performing bargaining unit work in the following areas: Local 2222 (Boston and surrounding communities), Local 2321 (northeastern Massachusetts), Local 2322 (southeastern Massachusetts), Local 2324 (western Massachusetts), and Local 2325 (central Massachusetts). Verizon named all of the Massachusetts IBEW Locals as defendants in this lawsuit with the exception of Local 2324.
System Council T-6 is an umbrella organization that represents the 7,810 members of all Massachusetts and Rhode Island IBEW Locals in collective bargaining. It is not a signatory to the CBA. The CBA expired at 11:59 p.m. on Saturday, August 6, 2011. The parties have and continue to engage in good faith negotiations in an effort to reach a new agreement. Despite these efforts, Locals 2222, 2321, 2322, 2324, and 2325 and System Council T-6 called a strike and commenced picketing Verizon’s facilities and remote work sites at or around 12:01 a.m. on August 7, 2011.
The defendant Locals are separate labor organizations affiliated with the IBEW. Each Local is governed by its own by-laws and constitution, elects officers and an executive board, and maintains a treasury funded by union dues. At the local level, business managers, assistant business managers, and picket captains coordinate strike activity. In general, the union leadership assigns striking workers to walk the picket line or engage in mobile picketing at their usual place of employment. There are instances, however, when members of a Local stray into another Local’s geographic area during the course of mobile picketing. The leaders of the various Locals communicate with each other regularly about the conduct of the picketing, the progress of the bargaining, and related matters. Within each Local, officials communicate regularly with picket captains.
Verizon asks this Court to grant a preliminary injunction based upon alleged unlawful strike activity consisting of: (1) violence or threats of violence to non-striking employees; (2) gender-and ethnic-based harassment of non-striking employees; (3) dangerous driving activity by union members following non-striking employees to remote work sites; (4) impeding Verizon employees from working at remote work sites; and (5) blocking access to entrances and exits to and *58 from company facilities. Verizon alleges that injunctive relief is required because the local police departments are either unable or unwilling to provide adequate protection from such conduct. The Locals dispute these claims, arguing in part that Verizon is unable to establish that they have engaged in unlawful picketing activity. According to the Locals, the picketing has been lawfully conducted in a manner designed to deliver a protected message well within the rights of the union members under the NLRA. To the extent that some of the more aggressive activity has risen to the level of strike misconduct, the Local unions contend that this is rogue behavior not condoned or ratified by the unions. The Court will address each category of alleged unlawful activity and the adequacy of the police response.
1. Violence and Threats of Violence.
The credible evidence establishes that Verizon employees performing struck work have been subjected to violence and credible threats of violence in certain instances. Examples follow.
On August 7, 2011, a group of approximately ten picketers affiliated with Local 2222 confronted nonstriking workers, including Joseph McCauley and Michael Roe, at a remote job site on Sergeant Street in Revere. Picketers called McCauley a “fucking pussy” and threatened to “smash [his] face in” and “kill” him. Among the more vocal of the picketers was Local 2222 union steward John Colleran. Also present were Local officials Mike Bums, Bob Gibson, Martin Wells, and Steve Lyons. Picketers also kicked the front of the truck while McCauley was inside it, waiting for police to clear the picketers so that he could leave. In the context of the crowd, the shouted epithets, and the kicking of the truck, the threats of physical harm were credible. After hearing about this incident during the proceedings in this action, Local 2222 took action against John Colleran and Michael Bums, removing both from picket lines and assigning them to office duties.
On August 8, 2011, Robert Moore, a member of Local 2321, told Jason Cook, a non-striking Verizon manager working out of the Danvers garage, that he intended to come to Cook’s house and rape his wife. Moore made this threat in the presence of two picket captains, James DeCicca and Scott Coakley. Neither took any action to restrain Moore or to repudiate his conduct. In the context of the situation, although the particular threat made would not have appeared likely to be carried out, a reasonable person in Cook’s position would have feared for his physical safely.
John Dudley is a Verizon finance manager who works out of Verizon’s corporate headquarters. During the strike, Dudley has reported to the Summer Street garage in South Boston. On August 10, 2011, he left South Boston at 7:00 a.m. followed by members of Local 2222. During an off-site repair job at a private residence in Lexington, the picketers called him a “faggot,” promised to sodomize him, informed Dudley that they knew where he lived, and threatened to kill him. On his way out, a large striking employee emerged from a crowd of approximately twelve union members to confront Dudley. He stood one or two inches from Dudley’s face. Dudley felt the angry man’s spittle as he screamed, “You’re dead.” At first, a police officer working a paid detail did nothing to assist Dudley. The police officer, when asked by Dudley’s partner to intercede, instructed the hostile picketer to stop swearing. The picketer complied with the police officer’s command. In the context, including the number of people present, their hostility, their proximity, and the relative sizes of the people involved, the threats made to Dudley were such as to place a reasonable person in his position in fear for his physical safety.[2]
On August 10, 2011, David Maffee, a Verizon special services foreman, was working in the presence of picketers at Cummings Park in Woburn. A picketer came behind him with two air horns, and blasted the horns within two feet of his head. Police were present, but took no action. The next day, August 11, 2011, at the same site, a striking employee stated words to the effect, “Maffee, if we see you in Woburn we will kill you.” This threat was made within earshot of a police officer on a paid detail, who again took no action. Although the particular threatened conduct may have been unlikely, in the context of the scene, and after the assault with the air horns on the previous day, a reasonable person in Maffee’s position would have feared for his physical safely.
Robert Ford is an operations manager at Verizon’s 185 Franklin Street office building. Each day of the strike, Ford leads a group of fifty-two employees, mostly women, on foot through a small gap in the picket line carved out by the police in front of the building. The number of picketers ranges from 25-50 in the morning to 100 at the end of the day. While the non-striking employees run this gauntlet, members of Local 2222 have shouted epithets at Ford and the other employees, including particularly offensive gender-based epithets at the women. Picketers have called Ford a “mother fucker,” and informed him that they “know who he is and where he lives.” One picketer bumped him, while another ran toward him, pointing his finger into Ford’s face and shouting epithets while standing close enough for Ford to feel the picketer’s spittle. Another picketer put his finger in the face of another employee, Paul Feeney. Other picketers have blown air horns close to Ford. The shouting, epithets, and physical closeness, although not the use of air horns, has occurred on a daily basis, despite the presence of multiple police officers on detail. Some of the non-striking employees experiencing this daily harassment have broken down and cried after entering the lobby of the building. In the circumstances presented, including the size of the crowd and proximity of its members, reasonable persons in the posi *59 tion of Ford and the employees with him would feel coerced and would perceive a threat to their physical safety.
On August 9, 2011, Demetra Santos was dispatched to a service call in Wakefield. Upon her arrival, members of Locals 2222 and 2321 swarmed her vehicle and shook it, taunting her to exit and hurling vulgar and gender-based epithets. Reasonably in the circumstances, Santos was afraid to get out of her truck to perform her work. When she did get out, the picketers swarmed toward her, with one man screaming close to her face. Two or three police officers were working a paid detail at the job site, but did not intervene to assist Santos until she called out to them to request protection. Later, one of the picketers thrust an air horn into Santos’s vehicle and blasted it near her head, causing pain and ringing in her ear. John Colleran, a Local 2222 steward, was present during these events.
On August 11, 2011, Joseph McCauley was assigned to transport a female news reporter to a Verizon garage in Woburn. When they arrived, some 35-40 picketers were present, as well as two police officers. As McCauley waited for police to clear the picket line so that he could drive into the garage, picketers kicked and punched the truck and put signs over its windshield, blocking McCauley’s vision. Picketers also yelled threats, in vulgar language, toward McCauley and his passenger, including “I’m going to rip your cunt open.” In context, including the crowd and the physical contact with the truck, although the particular threat expressed was unlikely to be carried out, persons in the position of McCauley and his passenger would reasonably fear for their physical safety.
2. Gender- and Ethnic-Based Harassment.
Three female employees have experienced gender-based harassment while performing struck work at remote locations. As described supra, on August 9, 2011, Demetra Santos was subjected to gender-based epithets from members of Locals 2222 and 2321 at a site in Wakefield. During the same incident, picketers subjected another female non-striking employee, Kathy Reed, to crude, humiliating, gender-based comments. During the incident in Revere described supra, picketers similarly taunted a female manager by proclaiming their affection for “big girls,” and asking if she was a transsexual. Apart from these instances of remote job-site sexual harassment, as described supra, female non-striking employees entering Verizon’s 185 Franklin Street office building on foot, through the gauntlet of picketers, have been called vulgar, gender-based slurs by members of Local 2222, and have reacted in a manner that demonstrates the substantial emotional and coercive effect of such conduct.
On August 8, 2011, Harry Lu, a Verizon engineer, departed the Framingham garage in a bucket truck driven by non-striking employee Yu Zhang. A mobile picketer affiliated with Local 2325 approached the bucket truck on foot as the two men were stopped at a traffic light. The picketer banged on the Verizon vehicle window and screamed racial epithets at Lu and Zhang, calling them “fucking gooks,” and promising “I will fucking get you!” Lu was understandably frightened by this encounter with the striking employee.
After learning about these incidents during this proceeding, union officials have taken some action to address them. Local 2321 in particular has held meetings with stewards and picket captains, reviewed procedures for picketing, and conveyed instructions that threatening and discriminatory language should not be used.
3. Dangerous Driving Activity.
Due to the nature of Verizon’s repair and installation business, the Locals decided to follow Verizon employees from garages to remote locations and picket the struck work. Picketing guidelines prepared in advance of the strike inform its members that strikers are permitted to “follow the work and engage in picketing at other worksites.” Absent from the guidelines, and missing from the oral instructions provided by union leadership, is any warning against engaging in reckless driving, or any other instruction regarding the manner of driving while following non-striking employees to remote locations.
Prior to the August 10, 2011, filing of this action, a number of Verizon employees were run off the road. For example, on August 8, 2011, a black Chevrolet Avalanche driven by a member of Local 2321 cut off a bucket truck operated by Robie MacLaughlin. MacL-aughlin was forced to swerve two to three feet into the oncoming lane to avoid a collision. Later that day, at approximately 6:00 p.m., a beige Mercuiy Grand Marquis driven by a member of Local 2321 cut in front of MacLaughlin’s vehicle on Route 1A. MacLaughlin slammed on his brakes to stop in the middle of rush hour traffic. A car driving behind MacLauglin had to stop abruptly to avoid rear-ending MacLaughlin’s vehicle.
On August 8, 2011, the same picketers who insulted Lu and Zhang also cut them off and played a dangerous cat and mouse game with them on Route 495, speeding up and slowing down to prevent their truck from exiting the highway. In addition, on August 9, 2011, Verizon employees Mike Roe and Adrienne Farrar were chased by five or six cars of striking employees in Wakefield, and one car drove across the median at Farrar’s vehicle, nearly causing a head-on collision. Roe and Farrar turned in an effort to escape, only to discover that they had entered a cul-de-sac. Picketers turned in after them, but did not block their exit. As they left the cul-de-sac, Roe and Farrar observed stewards Mike Bums and Rob Bradley on the side of the road.
*60 Although union leadership had not explicitly prohibited unsafe driving during mobile picketing before this action, no evidence indicates that union leadership was actually aware of these instances of driving to endanger before or during their occurrence. After hearing about these incidents during the TRO hearing, union leadership acted responsibly by notifying membership of the terms of the TRO and instructing membership that driving to endanger would not be tolerated. The Court has heard no evidence of unsafe driving thereafter.
4.Impeding Work Performed at Remote Job Sites.
Once the non-striking employees set up at remote sites, the striking employees establish pickets to protest the struck work. On occasion, disruptive behavior by picketers succeeded in preventing non-striking employees from conducting Verizon’s business. For example, Joseph McCauley and a crew of non-striking employees delayed repairing a failed cable on Sergeant Street in Revere due to the threatening conduct of Local 2222 members, as described supra. The nonstriking employees shut the job down for a period of time because they reasonably believed it was unsafe to continue without additional police officers. Similarly, Demetra Santos and those with her aborted the work at the Wakefield site on August 9, 2011, because they felt unsafe, despite the presence of police. In another incident, on August 8,2011, Steve Feeney was forced to stop working and return to the South Boston garage out of concern for his and his partner’s safety when they were surrounded by approximately fifty to sixty picketers on Devonshire Street in downtown Boston.
In some instances, picketers have blocked Verizon vehicles from leaving remote job sites. On August 8, 2011, at a site in West Newbuiy, Robie MacLaughlin got into his Verizon vehicle to leave after finishing his work. Picketers formed lines in front of and behind the vehicle, preventing him from moving. He called police, and waited ten minutes in the vehicle until police arrived and dispersed the picketers. John Dudley, at the end of the Lexington incident and after he had escaped from the angiy crowd, had to wait another five or ten minutes inside the truck until police directed picketers to clear a path for him to drive the truck away. Steve Feeney and his partner had to wait in their truck for ten to twelve minutes, after calling 911, until a lieutenant arrived to disperse picketers surrounding the truck. While a Local 2222 union steward, Martin Sweeney, held up a sign that read, “Boston Police Support IBEW,” two nearby patrol officers did nothing to disperse the crowd or stop strikers from banging on Sweeney’s truck.
5.Blockage of Ingress and Egress at Verizon Facilities.
The police departments in the numerous jurisdictions involved in this labor dispute have developed ad. hoc procedures to regulate the manner in which nonstriking employees are permitted to enter and exit Verizon facilities. The procedures share a few common traits: the non-striking employees are required to stop before entering or exiting a garage or the gate to a facility; the strikers are allowed to walk back and forth across the gate (or entrance or exit) for either a set number of turns or a predetermined time period; the ranking police officer on scene (in his or her discretion) decides that the strikers have delivered their message to the non-striking employee; the police officers part the picket line and permit one vehicle (sometimes expanded to two or three vehicles during peak hours) to enter or leave the facility. The strikers re-establish the picket line and the procedure starts anew with the next vehicle in the queue. The duration of the delay depends upon a number of factors, including the number of vehicles seeking to enter or leave the facility at a given time, the opinion of the ranking officer in charge as to what constitutes a reasonable time for the picketers to deliver their message, and the volume of traffic on an access road.
Although the parties may quibble about the length of delay attributed to a particular garage, it is uncon-troverted that non-striking employees do not have free and unfettered access to Verizon facilities. It is also clear that the delays are not isolated events; rather, the police, as a matter of course, provide strikers with what the police determine to be a meaningful opportunity to “get their message across” before vehicles are permitted to proceed. Recognizing that it is difficult to establish the average length of delays with anything approaching mathematical certainty, the Court finds that the credible testimony establishes the following estimates:
Danvers garage/Local 2321 (10 to 15 minutes)
Dorchester garage/Local 2222 (5 to 10 minutes)
Dracut garage/Local 2321 (3 to 12 minutes)
Framingham garage/Local 2325 (5 to 30 minutes)
Medford garage/Local 2222 (5 minutes)
South Boston garage/Local 2222 (lOto 15minutes)
Taunton MAC Center/Local 2322 (3 to 15 minutes)
Woburn garage/Local 2222 (5 to 10 minutes)
185 Franklin Street/Local 2222 (3 to 4 minutes)
6.The Police Response.
With few exceptions, Verizon has secured police protection for its non-striking employees and business interests only by hiring paid police details at substantial expense. The police departments do not have the resources to assign on-duty officers to Verizon facilities. For example, in Danvers, as described in the testimony of Chief Neil Ouellette, the police department deploys five police officers to the day shift, five to the evening shift, and four to the midnight shift. At present, six Danvers police officers are working paid *61 overtime details at the Danvers garage and a Verizon Wireless store.
An incident on August 12, 2011, in Medford, illustrates the inability of police departments to assist Verizon’s efforts to conduct its regular business. On that day, a crowd of approximately two hundred picketers, including a contingent of Teamsters as well as members of Locals 2222 and 2321, arrived at the Medford garage and picketed outside, preventing vehicles from exiting. One non-striking employee was trapped inside the building for nearly four hours. The supervising police officer, working a paid detail, stated that he could not guarantee the safety of any employees or vehicles that might attempt to cross the picket line to leave the premises. The police officer suggested that Verizon hire more detail officers to deal with the surge of picketers. Eventually a total of eleven detail officers were brought in to control the situation. Meanwhile, in the courtroom during the morning break, Verizon’s attorneys conveyed a request to union officials to address the situation. The union officials did so; the crowd then cleared; and Verizon’s personnel were able to leave the garage.
RULINGS OF LAW AND DISCUSSION
General Laws c. 214, §6, the Anti-Injunction Act, patterned on § 107 of the federal Norris-LaGuardia Act, 29 U.S.C. §101 et seq., establishes the legal standard applicable to a request for an injunction in any case involving or growing out of a labor dispute within the meaning of G.L.c. 149, §20C.[3] The purpose of the statute, like the Norris-LaGuardia Act, is to leave the resolution of labor disputes to negotiation and to prevent “courts from upsetting the natural interplay of the competing economic forces of labor and capital.” Trainmen v. Chicago R.&I.R. Co., 353 U.S. 30, 40 (1950). See also Sanford v. Boston Edison Co., 316 Mass. 631, 637-38 (1944) (principal purpose of the Anti-Injunction Act was to “regulate the issuance of injunctions restraining the acts of labor unions in trade controversies, that is to say, to regulate preventative injunctions”). To that end, the statute establishes rigorous requirements, and permits injunctions only under very limited circumstances. See, e.g., Jones v. Demoulas Super Markets, Inc., 364 Mass. 726, 727 (1974); see also Mengel v. Justices of the Superior Court, 313 Mass. 238, 245 (1943). Under §6(1), this Court may issue an injunction only upon:
findings of fact by the court to the effect:—
(a)That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;
(b) That substantial and irreparable injury to the plaintiffs property will follow;
(c) That as to each item of relief granted greater injury will be inflicted upon the plaintiff by the denial of relief than will be inflicted upon the defendants by the granting of relief;
(d) That the plaintiff has no adequate remedy at law; and
(e) That the public officers charged with the duty to protect the plaintiffs property are unable or unwilling to furnish adequate protection.
G.L.c. 214, §6(1). These requirements are stated con-junctively, so that “failure to find any one of them is fatal to injunctive relief.” Seekonk Family Drive-In Theatre, Inc. v. Madino, 340 Mass. 425, 428-29 (1960).[4]
Although §6 does not specify any standard of proof governing injunction proceedings, a heightened standard does appear in G.L.c. 149, §20B, which governs liability of individual members and officers, as well as their organizations, for “unlawful acts of individual officers, members or agents” of organizations involved in labor disputes. That statute protects individuals and organizations from liability except upon “clear proof’ of “actual participation, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.”[5] Although the language of that statute would appear directed at monetary liability for past events, our Supreme Judicial Court has, albeit in dicta, read §20B as applicable to injunctions as well. Tosti v. Ayik, 394 Mass. 482, 486-88 (1985), Citing Ramsey v. UMW, 401 U.S. 302, 310 (1971). This Court therefore applies the “clear prooF standard set forth in G.L.c. 149, §20B, with respect to actual participation, authorization or ratification by the persons or entities against whom injunctive relief is sought.
Here, as the findings set forth supra indicate, unlawful acts have been threatened, and have occurred, in the form of deprivation of liberty and access to property by means of threats, intimidation and coercion, as well as racial and sexual harassment in the context of employment.[6] Whether such acts will continue unless restrained is a more difficult question. In one area, it is clear that they will. The unions apparently believe that they are entitled to block access to Verizon facilities, at least for short periods of time, until police on the scene direct them to clear a path for each vehicle or person attempting to enter or exit. It is clear, therefore, that they will continue to do so unless restrained.
The evidence is less clear with respect to the other types of conduct. As to dangerous driving, as far as the evidence discloses, the unions have acted to stop it, and it has stopped. The temporary restraining order appears to have triggered more explicit instructions from the unions to their members than previously given, but it appears that the message has now been *62 sent and heard. The Court cannot conclude that a further injunction is necessary on this issue.
As to violent and threatening conduct of the various types described supra, as well as racial and sexual harassment, the Locals appear to agree that such conduct is inappropriate and should not occur. This case has provided a thorough airing of the unfortunate details of the conduct, along with identification of some of the perpetrators. Some of the Locals appear to have responded by taking some steps to try to prevent such conduct in the future, including giving instructions on the subject and removing certain of the worst offenders from picket lines. Whether those steps will suffice remains to be seen. The Court notes, however, that the worst incidents occurred during the first few days of the strike, and that tempers may have cooled somewhat since. Also, the Locals have indicated that they plan to reduce the number of picketers as the strike proceeds into its third week; smaller groups would seem likely to result in more restrained conduct. In these circumstances, the Court is not persuaded that an injunction is necessary at this time to prevent further conduct of this nature. For essentially the same reasons, the Court reaches the same conclusion regarding obstruction of Verizon’s work at remote sites. The worst incidents occurred early on, and the passage of time, reduction in the number of picketers, and development of routines with respect to placement of cones and the like appears likely to suffice.[7]
The question, then, is whether the Court can and should issue injunctive relief with respect to blocking of access to Verizon facilities. To obtain the injunction it seeks against such conduct against the named defendants, Verizon must prove that those defendants — the four IBEW Locals and System Council T-6 — have committed the acts or have authorized or ratified them after actual knowledge. G.L.c. 214, §6(l)(a). With respect to blocking access, the record establishes by clear proof that the leadership of all four of the Locals named have both authorized the conduct and ratified it after actual knowledge.[8] As to System Council T-6, the evidence is otherwise; nothing indicates that it has taken any action , or authorized or ratified any conduct, related to picketing. Its function, rather, appears to be limited to bargaining.
To warrant an injunction, Verizon must also prove that substantial and irreparable injuiy to its properly will follow from the unlawful conduct if not enjoined, and that it has no adequate remedy at law for that harm. G.L.c. 214, §6(1) (b) and (d). The Court is persuaded that Verizon has met this requirement by showing, as it clearly has, that without an injunction Verizon will continue to be deprived of full access to and use of its property. See Simon v. Schwachman, 301 Mass. 573, 582 (1938) (“Without question substantial and irreparable injuiy to the complainant’s property, namely, his right to do business free from-illegal interference, will follow”). Verizon has no adequate remedy at law for this harm; it cannot recoup the employee time lost, nor, as a practical matter, could it quantify and recover the monetary cost of that loss.
The Court is also persuaded that the injuiy to Verizon exceeds any injuiy that an injunction against blocking access will inflict on the Locals, as required by G.L.c. 214, §6 (l)(c). The Union’s legitimate interest is in communicating its message to the employer, to non-striking employees, to passersby, and to the general public. It will remain fully able to do so through peaceful picketing at and near Verizon facilities, without blocking access. The Union has no legitimate interest in coercing employees or others either to remain inside Verizon facilities when they choose to leave or to remain outside when they choose to enter. See Bloedorn v. Drivers, Salesmen, Warehousemen, Milk Processors, Cannery, Dairy Employees and Helpers Local, 695, 1989 WL 165246, *6 (W.D.Wis. Jun. 26, 1989); PTA Sales, Inc. v. Retail Clerks Local No. 462, 633 P.2d 689, 692 (N.M. 1981); Boston-Buffalo Exp., Inc. v. Teamsters Local Union No. 25, 1982 WL 156671 (Mass.Super. Feb. 26, 1982); American Ref-Fuel Co. of Southeastern Connecticut v. United Ass’n of Plumbers & Steamfitters, Local 305, 1991 WL 146626, *3 (Conn.Super. Jul. 26, 1991); compare Ornamental Iron Work Co., 295 NLRB 473, 479, 1989 WL 224144, *10 (Jun. 15, 1989) (“an instantaneous blockage, which allows those seeking access to freely choose between disregarding or honoring the picket line” is not misconduct justifying a refusal to rehire) (italics in orig.).[9]
The final requirement under c. 214, §(6) (1) (e), is that “the public officers charged with the duly to protect the plaintiffs property are unable or unwilling to furnish adequate protection.” The facts found supra establish this element. Despite Verizon’s substantial expenditures for paid details, police have not prevented picketers from blocking access to Verizon’s facilities, and no prospect appears that they will do so. To the contraiy, it appears that police in the various communities involved have followed a policy of allowing picketers to block the movement of each vehicle attempting to cross the picket lines for some period of time, sometimes short and sometimes longer, according to the discretion of the officer in charge at each scene.
Verizon has thus met its burden of proving each of the requirements under G.L.c. 214, §6 for the issuance of an injunction against the four Locals named barring blocking of access to its facilities. Defendants argue nevertheless that federal law preempts the authority of this Court to issue any injunction in this matter. A series of decisions of the United States Supreme Court has addressed the scope of federal preemption of state authority with respect to conduct arising in the context of labor disputes. See Sears, Roebuck & Co. v. San *63 Diego County District Council of Carpenters, 436 U.S. 180 (1978); San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959); Automobile Workers v. Russell 356 U.S. 634 (1958); Youngdahl v. Rainfair, Inc., 355 U.S. 131 (1957); Allen-Bradley v. Wisconsin Board, 315 U.S. 740 (1942); see also Kaplan’s Fruit & Produce Co. v. Superior Court, 26 Cal.3d 60, 68 (1979) (applying federal preemption decisions in construing state statutoiy grant of primary jurisdiction to administrative board).
Garmon, supra, established as a general guideline that state authorities must defer to the exclusive competence of the National Labor Relations Board with respect to conduct that is clearly or even arguably either protected or prohibited by the National Labor Relations Act. Id. at 244. Garmon nevertheless recognized exceptions, including “where the regulated conduct touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the States of the power to act.” Id. at 243-44. In the latter category of situations, the Court observed, “State jurisdiction has prevailed . . . because the compelling state interest... in the maintenance of domestic peace is not overridden in the absence of clearly expressed congressional direction.” Id. at 247. The situations that fall into that category, the Court observed, have generally been limited to those involving actual or threatened violence to persons or destruction of property, or coercion.[10]
Sears, supra, elaborated on and refined the guideline established in Garmon, in the context of an injunction issued by a state court against picketing on private-property. The trespass in issue, as a matter of federal law, was arguably either prohibited or protected, depending on its particular purpose. 436 U.S. at 185-86. The Court nevertheless ruled the state court injunction permissible, based on a balancing of the state interests involved with the risk of interference in the federal regulatory scheme. The Court explained that “the history of the labor pre-emption doctrine . . . does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected.” Id. at 188. “[Ijnilexible application of the doctrine is to be avoided, especially where the State has a substantial interest in regulation of the conduct at issue and the State’s interest is one that does not threaten undue interference with the federal regulatory scheme.” Id. at 188, quoting Farmer v. Carpenters, 430 U.S. 290, 302 (1977).
With respect to conduct arguably prohibited under the NLRA, the Court held, “(t]he critical inquiry ... is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to ... or different from . . . that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court’s exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board .. .” Id. at 197. Even with respect to arguably protected conduct, where supremacy considerations would be stronger, and where the state court would necessarily have to decide whether the conduct is protected under federal law, the Court nevertheless determined that preemption was not required, because, in the procedural circumstances presented, “there was in fact no risk of overlapping jurisdiction,” since the employer in that case had “no acceptable method” of bringing the matter before the NLRB. Id. at 201-02.
Preemption might nevertheless be required in some instances, the Court observed, to prevent misinterpretation of federal law. ‘Thus, the acceptability of ‘arguable protection’ as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that §7 [of the NLRA] does in fact protect the disputed conduct.” Id. at 203. In that regard, the Court noted its previous holdings, in a series of cited cases, “that state jurisdiction to enforce its laws prohibiting violence, ... or obstruction of access to property is not pre-empted by the NLRA,” because those violations of state law do not involve protected conduct. Id. at 204 (internal citations omitted).
These decisions establish that this Court has the power to enjoin conduct involving violence, coercion, or obstruction of access to property; such conduct falls directly within the concerns of state law. The exercise of that power necessarily requires the Court to distinguish between peaceful picketing, which is protected under the NLRA, and obstruction of access, which is not. That determination is a matter of fact, which is well within the competence of this Court; the possibility that the Court might err in making such a determination does not bear on the question of preemption. See Kaplan, 26 Cal.3d at 70 (The possibility that the Union is innocent of the charged conduct may be grounds for denying injunctive relief, but it does not invoke the preemptive jurisdiction of the board”). That the NLRB might, in certain procedural circumstances, be called upon to make a similar determination does not divest this Court of jurisdiction to do so here.[11] The Court concludes, therefore, that the NLRA does not preempt its jurisdiction over the issues presented by the present motion.
CONCLUSION AND ORDER
For the reasons stated, the plaintiffs request for a preliminary injunction is ALLOWED. Upon the filing of a surety bond in the amount of $10,000.00, a preliminary injunction will enter as follows: The defendants, Locals 2222, 2321, 2322, and 2325 of the International Brotherhood of Electrical Workers, and their *64 agents, representatives, employees, members, and all other individuals acting under the control and direction of each of these four Locals, are enjoined and restrained from blocking ingress to or egress from, or free access to, whether by vehicle or on foot, the plaintiffs garages, offices, or business premises, by any means, including but not limited to physical obstruction, intimidation, coercion, violence or threat of violence.[12]
CONCURRING OPINION
Cratsley, John C., J. Having participated in the decision in Eastern Middlesex Press Publications, Inc. v. Boston Typographical Union No. 13, which we distinguish in footnote 9,1 wish to add some concurring thoughts. The question whether some brief period of delay of employees and/or motor vehicles entering and exiting the plaintiffs facilities is protected by the defendants’ First Amendment informational rights is briefly mentioned in this opinion. Each case is decided on its particular facts and sufficient evidence was presented to this tribunal by the plaintiff that the defendant unions authorized and ratified blockages of free access to the plaintiffs facilities that in some instances were intimidating, coercive and involved violence and/or the threat of violence. Therefore, I feel the Preliminary Injunction issued today addressing blockages is specifically designed to end the unlawful union behavior described in the Findings of Fact. Whether “the brief stopping of employees which is only incidental to non-coercive picketing activity,” Comcast Cablevision of New Haven, Inc., 325 NLRB 833, 837, 1998 WL 271622, *9 (May 22, 1998), violates relevant labor and/or public safety laws in Massachusetts may well come before another three-judge panel in the future.

See Verizon v. IBEW, Local 827, No. 12062-11, August 11, 2011 (N.J.Super.) (union enjoined, by stipulation, from interfering with ingress to and egress from Verizon premises, utilizing more than one vehicle to follow Verizon employees, and picketing with more than six picketers); Verizon v. Communications Workers of America, No. 6766-CS, August 10, 2011 (Del.Ch.) (union enjoined from interfering in any manner with ingress to or egress from Verizon premises, picketing by more than six picketers, and engaging in acts of harassment or intimidation); Verizon v. Communications Workers of America, No. 11-19111, August 8, 2011 (Pa.Ct. Common Pleas) (union enjoined, by stipulation, from blocking or hindering entrances to Verizon facilities to prevent ingress or egress and picketing by more than six picketers); Verizon v. Communications Workers of America, No. 11-109224, August 12, 2011 (N.Y.Sup.Ct.) (stipulated injunction barring picketing closer than fifteen feet from entrance and otherwise blocking ingress or egress).

Dudley is slender and appears youthful.

General Laws c. 149, §20C(c) defines “labor dispute" as “any controversy arising out of any demand of any character whatsoever concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange, terms or conditions of employment, regardless of whether the disputants stand in proximate relation of employer and employee.” The parties to this action do not dispute-that this case arises from a labor dispute within that definition.

Additional procedural requirements appear in G.L.c. 214, §6(2).

General Laws c. 149, §20B reads: “No officer or member of any association or organization, and no association or organization, participating or interested in a labor dispute, as defined in section twenty C, shall be held responsible or liable in any court for the unlawful acts of individual officers, members or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.”

See, e.g., G.L.c. 12, §111; c. 151B, §4; c. 214, §1C.

Of course, the Court would reconsider the necessity of an injunction as to these types of conduct if evidence were presented of additional incidents hereafter.

Since the Court has concluded that no injunction is necessary at this time to prevent further conduct of the other types discussed, it need not address the question of the responsibility of the Locals for such conduct. The Court notes, however, that, as found supra, stewards of Local 2222 participated in some of the most egregious misconduct, and other officials of that Local were present during such incidents and did not take the opportunity to repudiate the conduct. The Court notes further the recurrent nature of the conduct at 185 Franklin Street, including the use of gender-based epithets in a highly volatile and intimidating setting. Should such conduct recur within the jurisdiction of Local 2222, the inference of authorization and/or ratification would seem strong.

To the extent that an earlier decision by a panel of this Court, issued on different facts, may appear to have suggested a different view regarding the legality of blocking of access to an employer’s premises, this panel declines to follow it. See Eastern Middlesex Press Publications, Inc. v. Boston Typographical Union No. 13, 1995 WL 809579, *11-12 (Mass.Super. Jun. 7, 1995) [4 Mass. L. Rptr. 44].

Three of the cases cited by the Court as examples are particularly pertinent here: United Automobile Workers v. Russell, 356 U.S. 634 (1958) (affirming punitive damage award based on coercive and violent conduct during picketing that prevented non-striking employee from entering workplace); Youngdahl v. Rainfair, 355 U.S. 131 (1957) (affirming injunction insofar as it barred picketers from threatening, intimidating, or coercive conduct and from obstructing ingress and egress to employer’s property, but reversing insofar as it barred all picketing); Auto Workers v. Wisconsin Board, 351 U.S. 266, 267-65 (1956) (affirming injunction against obstruction of entrance to and egress from employer’s premises).

The Court notes that, according to the information provided to it, the employer has no practical means of obtaining timely relief from the NLRB on this issue. It thus appears that, as in Sears, supra no actual risk of overlapping jurisdiction exists.

By design, this injunction is far narrower than those other courts have issued, in most cases by stipulation, with respect to this strike. See note 1, supra The Court expects the Locals to comply with its order without the need of delineation as to distances, numbers of pickets, and the like. The Court stands ready to provide further specificity if necessary.